NOTICE

Decision filed 04/27/06. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-04-0728

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | |
|---|---|
| GEORGIA JUNE GEE, Personal Representative of the Estate of Kennith Gee, Deceased, and GEORGIA JUNE GEE, Executor of the Estate of Kennith Gee, Deceased, | ) Appeal from the<br>) Circuit Court of<br>) Jackson County.<br>) |
| Plaintiff-Appellant, | ) |
| v. | ) No. 99-L-9 |
| MICHAEL TREECE, M.D., | ) Honorable<br>) E. Dan Kimmel, |
| Defendant-Appellee. | ) Judge, presiding. |

_____

JUSTICE CHAPMAN delivered the opinion of the court:

The plaintiff, Georgia June Gee, appeals a judgment in favor of the defendant, Dr. Michael Treece, in this medical malpractice case involving the death of her husband, Kennith Gee. She argues that (1) she was entitled to a judgment notwithstanding the verdict and (2) the trial court abused its discretion in denying her motion *in limine* to bar the testimony of a defense expert witness on the grounds that he was disclosed late under Illinois Supreme Court Rules 213(f)(3) and (i) (Official Reports Advance Sheet No. 8 (April 17, 2002), Rs. 213(f)(3), (i), eff. July 1, 2002) and 218(c) (Official Reports Advance Sheet No. 22 (October 30, 2002), R. 218(c), eff. October 4, 2002). We affirm.

On January 26, 1997, Mr. Gee was admitted to Carbondale Memorial Hospital complaining of chest pains, shortness of breath, and a cough that produced some dark phlegm. Emergency room physician Dr. Stuart Hickerson diagnosed Mr. Gee with pneumonia. Mr. Gee was admitted to the hospital and treated for pneumonia by the

1

defendant, Dr. Treece. On the morning of January 27, Dr. Treece ordered a test called a VQ scan to rule out the possibility of a pulmonary embolism. A pulmonary embolism is a condition that develops when a blood clot blocks the flow of blood to a portion of the lungs. Dr. Treece believed that Mr. Gee's symptoms (including a cough with phlegm, a fever, and an elevated white blood cell count) were consistent with Dr. Hickerson's initial diagnosis of pneumonia; however, Mr. Gee had undergone surgery to repair a hernia three weeks prior to his admission, which is a risk factor for developing a pulmonary embolism. Dr. Ronald Stumbris, a nuclear medicine radiologist, read the results of the VQ scan and found that it indicated a low probability for a pulmonary embolism. Based on this reading, Dr. Treece continued to treat Mr. Gee for pneumonia.

On February 7, 1997, Mr. Gee died. An autopsy performed by Dr. Chandresha Padmaltha revealed that Mr. Gee died of a massive saddle embolus (a type of blood clot) in his pulmonary artery. It is undisputed that this was the cause of death. It is also undisputed that the pulmonary embolism had developed before Mr. Gee was admitted to Carbondale Memorial Hospital and that his chances for survival would have been quite high had it been diagnosed and treated in time.

On February 3, 1999, the plaintiff filed a wrongful death action, naming Dr. Treece, Carbondale Memorial Hospital, and Dr. Stumbris as defendants. Early in July 2003, the plaintiff entered into a settlement with the hospital and Dr. Stumbris. Prior to the settlement, the plaintiff had disclosed to the defendants, pursuant to the version of Supreme Court Rule 213(g) then in effect (177 Ill. 2d R. 213(g)), that she intended to call Dr. Barry Siegel as an expert witness. Dr. Siegel, a radiologist, gave a discovery deposition in which he opined that Dr. Stumbris had read the results of Mr. Gee's VQ scan incorrectly. Dr. Siegel explained that the test results should have been read as indicating an intermediate probability for a pulmonary embolism. An intermediate-probability VQ scan indicates a 15% to 85% chance

2

that the patient is suffering from a pulmonary embolism, while a low-probability VQ scan indicates a 5% to 15% chance. A treating physician considers the VQ scan results along with risk factors and clinical symptoms observed in the patient to determine whether a more conclusive but more invasive test called a pulmonary angiogram is warranted. This distinction is significant in the instant case because Dr. Treece testified that, had he been told that the VQ scan indicated an intermediate probability of a pulmonary embolism, he would have begun treating Mr. Gee for a pulmonary embolism with heparin and ordered a pulmonary angiogram.

On June 23, 2003, Charles Schmidt, counsel for Dr. Treece, sent a letter to the plaintiff's counsel, William Meacham, advising him that in the event that the plaintiff no longer intended to call Dr. Siegel as a witness, the defendant wanted to schedule an evidence deposition for use on his behalf. A deposition was scheduled for August 2. On July 30, however, the plaintiff's attorney, Meacham, informed Schmidt that Dr. Siegel's deposition would need to be rescheduled because Meacham had scheduled a family vacation that conflicted with the August 2 deposition. Schmidt attempted to reschedule the deposition, but Dr. Siegel informed him that he would be traveling abroad and would not be available to give a deposition prior to the trial.

On September 3, the defendant filed a supplementary disclosure indicating that he intended to call Dr. Bradley Stufflebam as an expert witness. The disclosure indicated that Dr. Stufflebam would testify that Dr. Stumbris had read the VQ scan incorrectly and that it in fact indicated an intermediate probability that Mr. Gee suffered from a pulmonary embolism. On September 24, Dr. Stufflebam gave an evidence deposition in which he testified consistently with the disclosure.

Counsel for the plaintiff did not move to quash or attend Dr. Stufflebam's deposition. On September 25, 2003, however, the plaintiff filed a motion *in limine* seeking to exclude the

evidence deposition from the trial. She argued that (1) the defendant failed to comply with Rules 213 and 218 when he disclosed Dr. Stufflebam's identity only 48 days before the trial and (2) Dr. Stufflebam lacked the requisite expertise to render an opinion because the supplemental disclosure stated that he practiced general radiology, rather than nuclear radiology. After a hearing in the matter, the court entered an order denying the plaintiff's motion *in limine* on October 15, 2003.

The trial began on October 20, 2003. The jury returned a defense verdict on October 28. On October 7, 2004, the court denied the plaintiff's posttrial motions. This appeal followed.

The plaintiff first argues that she was entitled to a judgment notwithstanding the verdict and that the trial court erred in denying her motion for that relief. We disagree. A party is entitled to a judgment notwithstanding the verdict only if the evidence so overwhelmingly favors that party that a contrary verdict could never stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). We do not believe that standard was met in the instant case.

Dr. Stephen Storfer testified as an expert witness on behalf of the plaintiff. He opined that Dr. Treece's treatment of Mr. Gee was appropriate during his first few days in the hospital. Dr. Storfer opined, however, that after January 31, Dr. Treece should have begun to suspect a pulmonary embolism in spite of the low-probability VQ scan reading. Dr. Storfer explained that a low-probability VQ scan result does not rule out the possibility of a pulmonary embolism. As previously noted, it indicates a probability of 5% to 15% (a very-low-probability reading would indicate a 0% to 5% chance of a pulmonary embolism). He also testified that test results can be inaccurate as often as 70% of the time.

Although Dr. Storfer testified that Dr. Treece provided appropriate care at least through January 31, he disagreed with Dr. Treece that Mr. Gee's hernia surgery was the only

4

factor that put him at risk of developing a pulmonary embolism. He explained that relative inactivity for prolonged periods of time increases a person's risk of developing a pulmonary embolism. This is why the hernia operation, which requires reduced activity during the recovery period, put Mr. Gee at some risk. Dr. Storfer testified that once Mr. Gee had been hospitalized for several days, his increased inactivity during this period put him at even greater risk of developing a pulmonary embolism (we note that the autopsy revealed that the clot actually developed before Mr. Gee was hospitalized). Dr. Storfer also explained that, at age 57, Mr. Gee was at greater risk of developing a pulmonary embolism than a much younger person would be, though he was at less risk than an elderly patient might be.

Further, Dr. Storfer opined that after the first few days, Mr. Gee's clinical symptoms should have prompted Dr. Treece to reconsider the initial diagnosis of pneumonia. Although some of the pneumonia symptoms Mr. Gee experienced were beginning to subside (such as his fever and elevated white blood cell count), he continued to experience chest pains, shortness of breath, an elevated pulse rate, and elevated blood pressure. Chest X rays were taken daily and they showed that the condition of Mr. Gee's lungs was declining, rather than improving. On February 5, two days before Mr. Gee died, Dr. Treece ordered the insertion of a chest tube to drain pleural fluid, which is fluid that accumulates around the lungs. The fluid drawn contained blood, which was most commonly associated with tuberculosis, lung cancer, or a lung infarct. A lung infarct is a condition that occurs when lung tissue has died, often due to a pulmonary embolism. A pathologist who tested the fluid extracted from the chest tube performed a centrifuge test and found "very few" white blood cells. This, opined Dr. Storfer, was an indication that the bloody pleural fluid was not caused by an infection. Dr. Storfer concluded that a reasonably competent internist in Dr. Treece's position would have begun to reconsider the diagnosis of pneumonia and consider the possibility of a pulmonary embolism at least by February 1.

5

Dr. John Daniels testified as an expert on behalf of Dr. Treece. He explained that in assessing the likelihood of a pulmonary embolism, doctors must consider the results of a VQ scan in conjunction with the patient's risk factors and the clinical symptoms presented. Symptoms such as a fever, a cough with dark phlegm, and an elevated white blood cell count–all of which Mr. Gee was experiencing upon his admission to Carbondale Memorial Hospital–are classic signs of pneumonia. Although a fever and an elevated white blood cell count can occur with a pulmonary embolism, they are quite rare. He also noted that pneumonia is a more common condition than a pulmonary embolism.

Both Dr. Daniels and Dr. Storfer testified that it is normal for lung congestion to persist even after other pneumonia symptoms diminish. Dr. Daniels opined that although Mr. Gee's symptoms continued after he had been treated for pneumonia for a few days, some of the symptoms improved. This, he opined, indicated that Mr. Gee was responding to the treatment he was receiving, which was consistent with the diagnosis of pneumonia.

Dr. Daniels noted that Mr. Gee was initially given Coumadin, a medication that thins a patient's blood, to reduce the risk of developing a clot. The Coumadin was discontinued once Dr. Treece was told that the VQ scan indicated a low probability of a pulmonary embolism; however, it takes several days to completely leave the bloodstream. Dr. Daniels opined that the bloody pleural fluid extracted from the chest tube on February 5 was possibly the result of pneumonia coupled with the blood-thinning effect of Coumadin. He noted that the white blood cell count found in the pleural fluid was above normal, which was also consistent with pneumonia.

Dr. Daniels opined that, given the low-probability VQ scan and the other relevant factors, ordering a pulmonary angiogram would have been inappropriate due to the risks associated with the procedure. He concluded that a reasonable internist in Dr. Treece's position could not have known that Mr. Gee suffered from a pulmonary embolism.

6

Considering the evidence as a whole, we think that the plaintiff presented ample evidence that Mr. Gee in fact died of a pulmonary embolism, that it developed prior to his admission to the hospital, and that, had it been diagnosed in time, there was a high likelihood of his survival. These facts were not really in dispute, however. At issue was whether Dr. Treece's care fell below the appropriate standard, considering the low probability he was told the VQ scan indicated–a result that we know, in retrospect, was not correct–coupled with the risk factors and clinical symptoms he was able to observe during Mr. Gee's hospitalization. In other words, the issue was whether Dr. Treece was negligent for failing to diagnose a pulmonary embolism in light of the information he had to work with. See *Reardon v. Bonutti Orthopaedic Services, Ltd.*, 316 Ill. App. 3d 699, 710, 737 N.E.2d 309, 317-18 (2000) (stating that the standard of care a physician owes to a patient is an element that a plaintiff must prove). Although the record contained evidence from which the jury could conclude that Dr. Treece was negligent, the record also contained evidence from which the jury could reach the opposite conclusion. Thus, the evidence does not so overwhelmingly favor the plaintiff that a verdict in favor of the defendant cannot stand. The plaintiff was not entitled to a judgment notwithstanding the verdict.

The plaintiff next argues that the court erred in denying her motion *in limine* to bar Dr. Stufflebam's testimony. She argues that the disclosure was both untimely and inadequate. We first note that, although the plaintiff filed a motion *in limine* seeking to exclude the evidence deposition, she did not renew her objection at the trial. Thus, the issue is waived. See *Scassifero v. Glaser*, 333 Ill. App. 3d 846, 855-56, 776 N.E.2d 859, 867-68 (2002). A denial of a motion *in limine* does not preserve an objection to evidence later admitted at the trial. *Schuler v. Mid-Central Cardiology*, 313 Ill. App. 3d 326, 333, 729 N.E.2d 536, 542-43 (2000). A motion *in limine* ruling remains open to reconsideration by the court throughout the trial. *Schuler*, 313 Ill. App. 3d at 334, 729 N.E.2d at 543. Consequently, the party

7

seeking to exclude evidence that the court has previously considered must specifically object to the evidence when it is offered at the trial. *Schuler*, 313 Ill. App. 3d at 334, 729 N.E.2d at 543. However, because waiver operates as a limitation on the parties, not the courts, we will address the plaintiff's contentions regarding the timing of the disclosure, in order to provide some guidance to trial courts. See *People v. Murphy*, 322 Ill. App. 3d 271, 278, 752 N.E.2d 19, 25 (2001).

The plaintiff contends that the court erred in allowing the defendant's disclosure of Dr. Stufflebam's opinion pursuant to Rule 213 even though the disclosure came only 48 days before the trial, contrary to the timing provisions of Rule 218(c). Rule 213(f)(3) provides that upon written interrogatory, for any expert witnesses retained by the party to offer opinion testimony on the party's behalf, a party must disclose the subject matter of the testimony, the conclusions and opinions of the witness and the bases therefor, reports of the witness, and the witness's qualifications. Official Reports Advance Sheet No. 8 (April 17, 2002), R. 213(f)(3), eff. July 1, 2002. Rule 213(i) imposes an ongoing duty to supplement any materials disclosed pursuant to Rule 213 whenever new information becomes available. Official Reports Advance Sheet No. 8 (April 17, 2002), R. 213(i), eff. July 1, 2002. Rule 218(c) requires trial courts to set deadlines for the disclosure of opinion witnesses that will "ensure that discovery will be completed not later than 60 days" before the anticipated start date of the trial. Official Reports Advance Sheet No. 22 (October 30, 2002), R. 218(c), eff. October 4, 2002. Rules 213(f)(3), 213(i), and 218(c) are meant to be read together to ensure that discovery is completed no later than 60 days prior to the trial. Thus, information disclosed pursuant to Rule 213(i) must normally be disclosed no later than 60 days before the trial. *Scassifero*, 333 Ill. App. 3d at 855, 776 N.E.2d at 867. (We note that *Scassifero* involved former Rule 213(g), which contained the relevant provisions now found in Rule 213(f)(3).) The question is whether a disclosure less than 60 days before the trial acts as an

8

automatic bar to presenting the testimony no matter what circumstances led to the late disclosure.

Although not precisely analogous to the case before us, we find the Second District's analysis in *Scassifero* instructive. Much like the instant case, *Scassifero* was a medical malpractice case involving multiple defendants, some of whom settled with the plaintiff shortly before the trial. There, a hospital defendant timely disclosed its intention to call an expert witness pursuant to Rule 213(g) (177 Ill. 2d R. 213(g)). Two codefendants (a physician and a professional association) timely disclosed to the plaintiff that they intended to rely on any experts disclosed by the hospital in addition to their own witnesses. Their disclosure also indicated that they would rely on the hospital's disclosures of its witnesses' opinions. *Scassifero*, 333 Ill. App. 3d at 856-57, 776 N.E.2d at 868. When it looked like the hospital might settle with the plaintiff, the remaining defendants filed a supplementary disclosure specifically identifying one of the expert witnesses previously disclosed by the hospital. *Scassifero*, 333 Ill. App. 3d at 857, 776 N.E.2d at 869. This disclosure came 31 days prior to the scheduled trial date. *Scassifero*, 333 Ill. App. 3d at 856, 776 N.E.2d at 868.

At issue on appeal was whether the trial court abused its discretion in allowing the expert's testimony after the plaintiff objected on the grounds that he had been disclosed later than 60 days before the trial. The appellate court found that the disclosure should be deemed timely because the witness had been initially disclosed in a timely manner by the hospital and the remaining defendants disclosed their intention to call the witness as soon as possible once it was clear that the hospital was on the verge of settling with the plaintiff. *Scassifero*, 333 Ill. App. 3d at 857-58, 776 N.E.2d at 869.

Unlike *Scassifero*, the defendant here disclosed a witness who had not previously been disclosed to the plaintiff. The plaintiff in *Scassifero* presumably already had the opportunity to depose the witness in question and to develop an effective strategy for cross-examining the

9

witness, before the nonsettling defendants specifically disclosed their intent to call him as a witness. However, the distinction is mitigated here by the fact that the newly disclosed witness's intended testimony was essentially the same as that of the plaintiff's own witness. Furthermore, we do not find the distinction dispositive because two very important considerations underlying the *Scassifero* court's decision are likewise present in the case before us. The *Scassifero* court found it significant that (1) the nonsettling defendants disclosed the witness promptly once they realized the hospital was going to settle and they could no longer rely on the hospital's disclosure (*Scassifero*, 333 Ill. App. 3d at 857-58, 776 N.E.2d at 869) and (2) the purpose of Rule 213's requirements was satisfied by the disclosures that occurred (*Scassifero*, 333 Ill. App. 3d at 857, 776 N.E.2d at 869).

As noted, the defendant timely disclosed to the plaintiff his intent to call Dr. Siegel as a witness should the plaintiff opt not to call him herself. The defendant first signaled the plaintiff of his intent to call Dr. Siegel as a defense witness in a letter dated June 23, 2003, set out as follows:

"You have identified Dr. Barry Siegel, St. Louis, as an expert. His deposition has been completed.

It is my expectation and assumption that Dr. Siegel will be testifying as a witness at the trial of this case.

The purpose of this letter is to inform you of my expectation that you will be calling him as a witness. In the event you do not plan to call him as a witness at trial[,] I hereby request that you advise me so that appropriate arrangements can be made to obtain his deposition testimony for possible use on behalf of my client.

It would appear to me that this testimony will be necessary in order for you to establish a prima facie case based upon the claimed misreading of the VQ scan. Nonetheless[,] the status of the parties and the litigation can change. For this reason[,]

10

I want you to be specifically aware of my expectation that Dr. Siegel will be testifying at trial at your request and that[,] should you elect not to call him[,] I hereby request that you advise me of that fact and provide me with an opportunity to obtain his evidentiary deposition for use at trial.

Since Dr. Siegel is your expert[,] I believe it would be inappropriate for me to directly contact him and arrange such a deposition. Accordingly[,] I am bringing this issue to your attention sooner, rather than later, so there will be no confusion at the time of trial."

As the letter predicted, the status of the litigation changed when the plaintiff settled her claim against Dr. Stumbris and the hospital on July 15, 2003. Following the settlement, the defendant noticed up an evidence deposition for Dr. Siegel for August 2, 2003. The deposition, however, was cancelled on July 30 due to the plaintiff's counsel's vacation plans. On August 16, the defendant formally disclosed Dr. Siegel by a pleading captioned "Expert Disclosure." This disclosure was within 60 days of the trial date. Defense counsel's attempts to reschedule Dr. Siegel's deposition were cut short when Dr. Siegel advised him that he was leaving the country and would not be available to give a deposition prior to the trial. The defendant then asked the plaintiff to agree to have a portion of Dr. Siegel's discovery deposition read into evidence; the plaintiff did not agree to the request. It was after this series of events that the defendant procured another witness–Dr. Stufflebam–to in effect supply the same testimony regarding the VQ reading that had been anticipated from Dr. Siegel.

Although Dr. Siegel was originally the plaintiff's retained expert, his status as an expert became somewhat unclear after the plaintiff settled her suit against Dr. Stumbris and the hospital. And while there was no requirement that Dr. Siegel provide testimony on the defendant's behalf after the plaintiff apparently no longer intended to call him as a witness,

11

neither the plaintiff's attorney nor the doctor advised the defendant that he would not serve as a witness until after the 60-day deadline had run.

We find that the disclosure in this case satisfied the dual purpose behind the discovery rules, which is to avoid surprise and discourage tactical gamesmanship. See *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109-10, 806 N.E.2d 645, 652 (2004). Because demonstrating that Dr. Stumbris had read the VQ scan incorrectly was a crucial element in the plaintiff's case against Dr. Stumbris and the hospital, the plaintiff can hardly claim surprise when Dr. Treece attempted to capitalize on this fact as a part of his own defense. Further, barring the expert's testimony under the facts in this case might encourage tactical gamesmanship rather than discourage it. While we express no opinion regarding the motivation of the plaintiff's counsel, we think that a mechanical application of the 60-day deadline under the circumstances presented could encourage parties to cause delays which might force opposing parties into a late disclosure of alternate witnesses, thereby unfairly gaining a tactical advantage. Whether to admit opinion testimony pursuant to Rule 213 is a matter within the discretion of the trial court, and we will not overturn its decision absent an abuse of that discretion. *Sullivan*, 209 Ill. 2d at 109, 806 N.E.2d at 651. We conclude that the trial court properly exercised its discretion in denying the plaintiff's motion to bar Dr. Stufflebam's testimony.

The plaintiff also argues that the defendant failed to comply with Rule 213 by refusing to adequately disclose in advance the substance of Dr. Stufflebam's testimony. We note that the plaintiff did not provide the trial court with any opportunity to address the claimed inadequacies in the substance of the defendant's disclosure. She did not raise this issue in her motion *in limine*, nor did she object on this basis when Dr. Stufflebam's testimony was offered at the trial. Thus, she has waived consideration of this issue on appeal. Moreover, the plaintiff fails to identify in her opening brief the precise manner in which she contends

12

the disclosure was deficient.  Points not fully argued in an appellant's opening brief are waived and may not be raised in a reply brief or at oral argument.  188 Ill. 2d R. 341(e)(7).  In light of this, we choose not to address this argument.

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

HOPKINS and GOLDENHERSH, JJ., concur.

NO. 5-04-0728

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

———————————————————————————————————————————————

| | |
|---|---|
| GEORGIA JUNE GEE, Personal Representative of the Estate of Kennith Gee, Deceased, and GEORGIA JUNE GEE, Executor of the Estate of Kennith Gee, Deceased, | ) Appeal from the<br>) Circuit Court of<br>) Jackson County.<br>) |
| Plaintiff-Appellant, | )<br>) |
| v. | ) No. 99-L-9<br>) |
| MICHAEL TREECE, M.D., | ) Honorable<br>) E. Dan Kimmel, |
| Defendant-Appellee. | ) Judge, presiding. |

———————————————————————————————————————————————

**Opinion Filed**:     April 27, 2006

———————————————————————————————————————————————

**Justices**:     Honorable Melissa A. Chapman, J.

                Honorable Terrence J. Hopkins, J., and
                Honorable Richard P. Goldenhersh, J.,
                Concur

———————————————————————————————————————————————

**Attorneys**
**for**
**Appellant**     William J. Meacham, 521 St. Louis Street, Edwardsville, IL 62025; Robert D. Larson, 307 Henry Street, Suite 310, Alton, IL 62002

———————————————————————————————————————————————

**Attorneys**
**for**
**Appellee**     Charles E. Schmidt, Kenton J. Owens, Brandon, Schmidt, Goffinet & Solverson, 916 West Main Street, P.O. Box 3898, Carbondale, IL 62902-3898

———————————————————————————————————————————————