NO. 4-05-0847                                    Filed 6/27/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| TERESA CURI, Special Administratrix | ) | Appeal from |
| of the Estate of MERLE BRAY, | ) | Circuit Court of |
| Deceased, | ) | McLean County |
|     Plaintiff-Appellee, | ) | No. 01L171 |
|     v. | ) | |
| PATRICK B. MUPRHY, M.D., and | ) | |
| ILLINOIS HEART & LUNG ASSOCIATES, | ) | |
| S.C., a/k/a MID-CENTRAL CARDIOLOGY, | ) | Honorable |
| S.C., | ) | Charles G. Reynard, |
|     Defendants-Appellants. | ) |     Judge Presiding. |

_____

JUSTICE MYERSCOUGH delivered the opinion of the court:

In March 2005, plaintiff, Teresa Curi, special administratrix of the estate of Merle Bray, filed

her second-amended complaint against defendants, Patrick B. Murphy, M.D., and Illinois Heart &

Lung Associates, S.C., a/k/a Mid-Central Cardiology, S.C. (Illinois Heart), a group of cardiologists,

pulmonologists, lung doctors, and critical-care specialists.  At the time in question, Dr. Murphy was

a partner in Illinois Heart.

In March 2005, the jury returned a verdict in favor of plaintiff and against defendants in the

amount of $1,439,824.  The trial court later reduced the judgment by $25,000.  Defendants appeal,

arguing (1) the court erred by refusing to give the specialist standard-of-care instruction, (2) the

court erred by giving plaintiff's burden-of-proof instruction, (3) the court erred in excluding the

testimony of Dr. Wattanasuwan concerning the appropriateness of heparin for patients such as

Bray, and (4) the verdict was against the manifest weight of the evidence.

We affirm.

I. BACKGROUND

The jury trial commenced on March 18, 2005.  Because the parties are familiar with the facts

elicited at trial, we will set forth only those facts necessary for resolving the issues on appeal.

## A. Overview

On October 28, 2000, at approximately 4 p.m., Merle Bray, an 82-year-old man, sought treatment at John Warner Hospital in Clinton, Illinois, for pain in his lower chest and upper abdomen. The physicians at John Warner Hospital started Bray on nitroglycerin and intravenous heparin (hereafter referred to solely as heparin). Later that afternoon, John Warner Hospital transferred Bray to OSF St. Joseph Medical Center (St. Joseph).

Heparin is an anticoagulant and prevents blood from clotting. The biggest risk with heparin is bleeding. Heparin is monitored by the use of a nomogram. A nomogram is a prepared set of guidelines or rules by which personnel can monitor the intensity of heparin. The St. Joseph nomogram required drawing and testing Bray's blood at regular intervals to determine the partial thromboplastin time (PTT) level, a measure of coagulation. When a patient's PTT goes up, the blood's ability to coagulate goes down. The therapeutic range of PTT is between 30 and 70. Depending on the PTT level, the heparin dosage is adjusted. Under St. Joseph's nomogram, a PTT above 100 requires a decrease in the heparin dose (which the nurse can do automatically). A PTT above 150 requires the nurse to notify the physician.

After being transferred to St. Joseph, Bray was seen by Dr. Dhanasarn Mongklosmai (Dr. Dhan), a cardiologist and partner in Illinois Heart. Dr. Dhan was in charge of Bray's care from October 28, 2000, to October 29, 2000.

While under Dr. Dhan's care, Bray underwent an EKG and an echocardiogram test. Various enzymes were also checked. Bray continued to receive nitroglycerin and heparin that was started at John Warner Hospital.

Dr. Dhan transferred Bray's care to Dr. Murphy on October 30, 2000. Bray had been Dr. Murphy's patient for several years prior. Dr. Murphy had last seen Bray in September 2000 for minor cardiac problems but was only providing him follow-up care as of October 2000.

Dr. Dhan left Dr. Murphy a voice-mail message advising him of a differential diagnosis of

chest pain and possible acute coronary syndrome. A differential diagnosis is a list of those conditions that are consistent with the patient's history and symptoms. Physicians work through a differential diagnosis by putting at the top of the list those conditions that are immediately life threatening. Physicians rule out conditions that are immediately life threatening and then move on to those that are not immediately life threatening. Dr. Dhan reported to Dr. Murphy that the work-up on Bray was going to continue on the morning of October 30, 2000. Dr. Dhan also reported to Dr. Murphy that Bray's condition was probably gastrointestinal in nature.

On October 30, 2000, Bray underwent a Persantine Cardiolite Stress Test (Persantine test) supervised by Dr. Norrapol Wattanasuwan, a cardiologist employed by Illinois Heart. The Persantine test is a two-part test. The first part involves injecting an isotope and monitoring the patient's symptoms, heart rate, blood pressure, and electrocardiogram (EKG). The second part involves a nuclear scan. Dr. Wattanasuwan supervised the first part of the test. Dr. R. Puckett, a radiologist, interpreted and reported on the second part of the test. Dr. Wattanasuwan wrote a progress note in Bray's file that read, "negative stress EKG." Dr. Puckett's report was transcribed on October 30, 2000, at 3:33 p.m. His report indicated a normal study but noted Bray did not reach optimum exercise tolerance, which lowers the sensitivity of the study.

At approximately noon on October 30, Dr. Murphy went to Bray's hospital room but found his bed unoccupied. After inquiring, Dr. Murphy learned Bray was having his endoscopic retrograde cannulation of the pancreas (ERCP) performed by Dr. Herbert Wiser. Dr. Murphy assumed Bray passed his Persantine test because he could not imagine Dr. Wiser would have taken him for the ERCP if Bray had not passed the Persantine test. Dr. Murphy left the hospital without seeing Bray.

Dr. Wiser, a gastroenterologist, performed the ERCP. An ERCP is a procedure by which a tube with a camera is inserted in the patient's mouth and passed down through the esophagus and stomach, into the second part of the duodenum where a structure that looks like a "pap" is identified and cannulated. A probe is put through the pap and dye is injected into the pancreas and bile ducts to visualize whether stones are present. Three common complications with an ERCP are bleeding,

perforation, and infection. Dr. Wiser was able to see Bray's pancreatic duct but was unable to see the bile duct. However, he did make a small cut, a papillotomy, to allow for the passage of stones that might be in the bile duct. Dr. Wiser completed the procedure by 11:30 a.m. on October 30.

Prior to the ERCP procedure, Bray's PTT was barely in the therapeutic range. The heparin was stopped prior to the ERCP. The heparin was restarted at 2:20 p.m. following the surgery. Heparin was restarted at a higher level pursuant to the nomogram. By 10 p.m. on October 30, Bray's PTT was 110 and the rate of infusion was reduced.

At 6:30 a.m. on October 31, Bray spit up small amounts of dark red blood and had difficulty walking back to his bed. He also appeared jaundiced. Bray's blood was drawn at 4:42 a.m., and the results came in at around 7:15 a.m. Bray's PTT was over 150 and his white-blood-cell count was high. Deb Luker, the registered nurse, called Dr. Murphy, as required by the nomogram. Luker told Dr. Murphy that Bray was spitting up blood, suffering from weakness, and his PTT was greater than 150. Dr. Murphy told her to decrease Bray's heparin by 300 units.

At 11 a.m. on October 31, Dr. Murphy saw Bray for the first time since becoming his attending physician. Dr. Murphy noted Bray did not look well. After consulting with Dr. Wiser, Dr. Murphy believed Bray might have an evolving infection. Dr. Henry Naour performed an abdominal exploration on Bray. Dr. Naour found a retroperitoneal hematoma (blood collection in the retroperitoneum). Dr. Naour also removed Bray's gallbladder. Pathology found many gallstones in the gallbladder. No stones were found in the common bile duct.

At approximately 1:30 p.m. on October 31, 2000, Bray stopped breathing and a "code blue" was called. Bray was resuscitated but eventually died on November 8, 2000.

### B. Pleadings

On October 5, 2001, plaintiff, Bray's granddaughter, filed suit against St. Joseph and Dr. Wiser. The complaint named Dr. Dhan and Dr. Murphy as respondents in discovery. On May 20, 2002, plaintiff amended her complaint and added Dr. Wattanasuwan, Dr. Murphy, and Illinois Heart as defendants. Plaintiff's second-amended complaint, filed March 16, 2005, named only Dr.

Murphy and Illinois Heart.

The second-amended complaint contained wrongful-death and survival causes of action against both defendants as well as counts seeking funeral, burial, and medical expenses. Plaintiff alleged that Dr. Murphy breached the standard of care by failing to discontinue the administration of the heparin, failing to properly monitor the administration of heparin, and failing to communicate with other medical personnel regarding the status of Bray's condition. Plaintiff alleged that Illinois Heart, through its agents, servants, and/or employees, including but not limited to Dr. Wattanasuwan, Dr. Dhan, and Dr. Murphy, failed to discontinue the heparin, failed to monitor the administration of the heparin, failed to communicate with other medical personnel, and failed to facilitate proper communication between its physicians, and Dr. Wiser, nurses, and other hospital personnel.

## C. Specific Testimony at Trial

### 1. Dr. Michael Ramsey's Testimony

Dr. Michael Ramsey, plaintiff's retained expert, testified he was a retired internal-medicine specialist. His practice included 26 years of private practice at Rush Medical Center in Chicago, Illinois.

Dr. Ramsey received training on the diagnosis of acute cardiac conditions and gastrointestinal disorders. He had experience in the use of heparin. According to Dr. Ramsey, all doctors are required to know the indications for heparin therapy.

Use of heparin is contraindicated in someone who is already bleeding because heparin stops the blood from coagulating. The risks of heparin include bleeding from any site, but three areas are most associated with heparin-related bleeding: the retroperitoneal, adrenal, and ovarian areas.

Heparin works almost immediately and reaches its peak in one to two hours. When stopped, the blood returns to normal coagulation within hours. According to Dr. Ramsey, a PTT over 150 means "they can't even measure how high it is; it could be 151, could be 190 or could be

infinity, it may not be able to coagulate at all."

Continuous infusion of heparin is indicated in people with blood clots, abnormal heart rhythm, and acute cardiac disease. It is also proper to use heparin when a physician suspects a patient is having a heart attack and he or she is ruling that out. However, heparin is not used for routine chronic vascular disease, coronary artery disease, or valvular disease. Heparin is not used to treat gallstones or common-bile-duct stones.

Dr. Ramsey testified all doctors are required to know the indications for heparin therapy. Dr. Ramsey believed it was a breach of the standard of care to administer heparin in a patient without an indication for its use. Discontinuation is required after the indications for heparin's use are ruled out.

Dr. Ramsey noted Bray had mild aortic valve disease but stated that had nothing to do with coronary artery disease or myocardial infarction. Bray's EKG was normal and unchanged from one performed almost two years earlier. Bray's cardiac enzymes were totally negative. While Bray's myoglobin was elevated, myoglobin is not a specific cardiac enzyme. Myoglobin can come from any muscle. The specific cardiac enzymes were negative every time they were taken.

Bray's echocardiogram showed one of his valves was abnormal but that had nothing to do with the vessels of the heart "that we're talking about [with a] heart attack." Bray's Persantine test was normal. The significance of a negative stress EKG and normal Persantine test ruled out acute and chronic coronary artery disease. Dr. Ramsey concluded that by October 30, 2000, no evidence of significant cardiac disease existed.

Dr. Ramsey believed the administration of heparin resulted in Bray's massive retroperitoneal hemorrhage. The ERCP procedure had been performed in the area of the gallbladder, and the hemorrhage was in that area. Due to the hemorrhage, Bray suffered a huge blood loss that resulted in a lack of blood volume necessary to sustain organ function and led to multiple organ failure. Bray ultimately suffered a myocardial infarction due to the loss of blood.

According to Dr. Ramsey, the standard of care required immediate discontinuation of

heparin when no indication for its use exists, a patient shows signs of internal bleeding, or a patient has an unduly prolonged PTT, such as over 150. Dr. Murphy failed to comply with the standard of care by not discontinuing heparin when coronary artery disease was ruled out. Dr. Ramsey believed Dr. Murphy's failure to comply with the standard of care caused or contributed to Bray's bleed, multi-organ failure, and death.

Dr. Murphy initially breached the standard of care by not discontinuing the heparin when he became aware of the results of the cardiac tests prior to noon on October 30, 2000. At that point, Bray's PTT levels were below the therapeutic range, and no hemorrhage would have occurred had the heparin been discontinued.

By 10 p.m. on October 30, Bray's PTT had risen to 110. Then the level rose to a toxic level of 150. On Tuesday, October 31, when informed of the PTT level over 150, Dr. Murphy should have discontinued the heparin, but he only reduced the dosage. This also breached the standard of care. Dr. Ramsey also noted a lack of communication among the "consultants" in the 36 hours from when Bray was admitted until he was seen by his attending physician.

### 2. Dr. Patrick Murphy's Testimony

Dr. Murphy testified both during plaintiff's case and defendant's case. His testimony established he was board certified in internal medicine, pediatrics, cardiology, nuclear cardiology, and interventional cardiology. He became the primary physician overseeing all aspects of Bray's care on the morning of October 30, 2000. Early that morning, Dr. Murphy received a voice mail from Dr. Dhan that Bray most likely had a gastrointestinal problem. Dr. Murphy did not know whether Dr. Dhan told him Bray was receiving heparin.

Dr. Murphy did not see Bray or his chart the morning of October 30 because Bray was not in his room because he was downstairs having the ERCP procedure. Dr. Murphy admitted that if he had believed Bray had an ongoing cardiac condition on October 30, he would have made an effort to see him that day because the standard of care would have required it. He did not believe, however, he had a compelling reason to see Bray that afternoon because Dr. Wattanasuwan had

seen Bray that morning.

Dr. Murphy knew when he took over Bray's care that an acute myocardial infarction had been ruled out. Dr. Murphy gave conflicting testimony about when coronary artery disease had been ruled out. On the one hand, he admitted coronary artery disease had been ruled out by approximately 11 a.m. on October 30 because Bray would not have had the ERCP if the doctors were still concerned about acute myocardial infarction or coronary artery disease. On the other hand, Dr. Murphy admitted he did not know the results of the second part of the Persantine test until October 31. Dr. Murphy also admitted the EKG, echocardiogram, enzyme tests, stress EKG, and nuclear imaging all gave a good picture of Bray's cardiac status and no more cardiac testing was performed.

Dr. Murphy did not know Bray was on heparin until the nurse called him on October 30 to report the PTT level of 150. Dr. Murphy admitted he should have known his patient was on heparin. The nurse told Dr. Murphy that Dr. Wiser ordered the heparin restarted after the ERCP. Dr. Murphy did not discontinue the heparin at that time because he believed it would breach the standard of care to change a medication regime initiated by Dr. Wiser. Dr. Murphy did not call Dr. Wiser to inquire about why the heparin was restarted. Dr. Murphy said Dr. Wiser should have called him after the ERCP.

Dr. Murphy claimed it was his understanding that Bray was going for his ERCP and his heparin would have been stopped. He was never asked or notified that his heparin would be restarted after the procedure. However, Dr. Murphy also admitted that Illinois Heart has a set of standing physicians' orders used at St. Joseph. The gastroenterology standing-order form for postendoscopy has a preprinted provision that provides: "Resume preop meds and orders except ____." Bray's form did not contain an exception for any medications.

After the nurse's call, Dr. Murphy did not go see Bray immediately and did not stop the heparin. The nurse said Bray was doing fine and was in no acute distress. Although Bray had coughed up some blood, that was consistent with having had an ERCP. Dr. Murphy lived 1 1/2

miles from the hospital and could have been there by 7:30 a.m.

Dr. Murphy saw Bray at 11 a.m. on October 31. He admitted no compelling reason existed for Bray to be on heparin the morning of October 31.

Dr. Murphy agreed that Bray had twice had a PTT of over 150 (the second occurring at approximately 2:30 p.m. on October 31, 2000) supported the theory that Bray's bleed was heparin-related. Murphy agreed a retroperitoneal hematoma was one of the variables precipitating Bray's respiratory arrest on October 31. In fact, he admitted heparin may have contributed to Bray's death. However, Dr. Murphy also testified his actions did not violate the standard of care. Dr. Murphy testified the standard of care did not require the heparin be turned off.

### 3. Dr. Michael Blackstone's Testimony

Dr. Blackstone, a retired gastroenterologist and internist, testified as a retained expert for plaintiff. According to Dr. Blackstone, as of October 30, no indication for giving Bray heparin existed. Bray's tests and symptoms were indicative of gallstones passing into the common bile duct.

Dr. Blackstone testified that individuals on full heparinization will develop retroperitoneal hemorrhages 5% of the time. He estimated Bray bled two liters of blood into that space. Dr. Blackstone believed Bray's hematoma was caused by the use of heparin. The heparin should have been stopped by 7:15 a.m. on Tuesday, and, if that had occurred, it is likely the outcome would have been different. Bray died of the hemorrhage, which caused a massive myocardial infarction, then multi-organ failure precipitated by blood loss. Dr. Blackstone admitted he had never administered heparin but observed it being administered.

Dr. Blackstone found no indication in Bray's chart that the physicians involved in Bray's care were exercising clinical judgment to decide whether the heparin should continue after the ERCP. The exercise of judgment does not allow a physician to give a potentially lethal drug when there is no indication for its use. The original order for heparin was written by Dr. Dhan. By way of postendoscopy standing order, the heparin was restarted after the ERCP, regardless of whether Dr.

Wiser questioned it. Only the attending physician, Dr. Murphy, was "in a position to change [the order]."

#### 4. Dr. Dhan's Testimony

The material in this subheading and in subheadings 5 through 8 is nonpublishable under Supreme Court Rule 23.

**[The material in this subheading and in subheadings 5 through 8 is nonpublishable under Supreme Court Rule 23.]**

Dr. Dhan testified that in October 2000, he was a partner in Illinois Heart. He was involved in the treatment and care of Bray beginning October 28 and 29, 2000.

Dr. Dhan was familiar with heparin. A patient who does not have any injury to the blood vessels will not bleed with heparin. Dr. Dhan did not intend for Bray to receive heparin forever. Heparin was to be administered only until the physicians ruled out a cardiac condition.

Dr. Dhan claimed a myocardial infarction was ruled out on October 29. However, coronary artery disease was not ruled out because a person may have normal tests and still have coronary artery disease. He agreed, however, that he concluded by October 29 that Bray probably had gallstones. Dr. Dhan testified he left a voice mail for Dr. Murphy that he thought Bray's condition was probably gastrointestinal in nature. He told Dr. Murphy about the stress test and nitroglycerin. He did not recall whether he told Dr. Murphy that Bray was on heparin, but that it was his custom and practice to do so.

#### 5. Dr. G. Bradley Smith's Testimony

Dr. G. Bradley Smith testified by way of evidence deposition for defendants. Dr. Smith testified that he was a cardiothoracic and vascular surgeon employed by Illinois Cardiovascular and Thoracic Surgery, Ltd. He saw Bray in 1999 regarding a Doppler scan of Bray's carotid arteries. Bray had an asymptomatic mild-to-moderate blockage of his carotid arteries.

Dr. Smith had another contact with Bray on October 31, 2000, when Dr. Naour called him into the operating room. Bray had a large retroperitoneal hematoma, and Dr. Naour asked Dr.

Smith to help evaluate the source of bleeding. They were not able to determine the source. Because retroperitoneal bleeds can occur spontaneously, there was no way to say it was caused by heparin. According to Dr. Smith, heparin facilitates bleeding but does not cause it.

### 6. Dr. Herbert Wiser

Dr. Wiser, a gastroenterologist, was involved in two aspects of Bray's care: performing the ERCP and observing the abdominal exploratory surgery. Dr. Wiser performed the ERCP on October 30. He also observed the surgery performed by Dr. Naour on October 31. During that surgery, he observed Dr. Naour remove the gallbladder. Dr. Wiser stated he found no common-bile-duct stones but admitted that did not mean Bray never had them. The ERCP procedure may have allowed any common-bile-duct stones to pass through. The laboratory work and Bray's presenting illness indicated a high likelihood that Bray had common-bile-duct stones.

### 7. Dr. Norrapol Wattanasuwan's Testimony

Dr. Wattanasuwan testified by way of evidence deposition. Prior to reading his deposition testimony to the jury, the parties discussed and resolved certain issues raised therein. On motion for plaintiff and over the objection of defendants, the trial court struck the following testimony:

"Q[. (Richard D. Stites, defense counsel)]: Doctor, do you have an opinion to a reasonable degree of medical certainty as to whether there was benefit in giving heparin to a patient such as Mr. Bray?

A[. (Craig Mannarino, plaintiff's counsel)]: I'm going to object to the form and foundation.

A[. (Dr. Wattanasuwan)]: I could not answer you directly to--about Mr. Bray. I could--because as I mentioned to you, that I'm not serving as a physician who know[s] him in all the aspect[s] to make a good judgment about his care. I could answer you in general for the patient at this age present with some kind of presentation that's similar to him, has some cardiovascular pathology that [is] more or less similar to this case, I believe that, yes, there [is] a benefit of giving heparin to

this group of patients.  However, you need to keep in mind also that along with the great benefit came the great risk as well."

At trial, plaintiff objected to this testimony because Dr. Wattanasuwan's sole role was to perform the Persantine test. Therefore, Dr. Wattanasuwan lacked foundation to express his opinion of whether it was proper for Bray to receive heparin.

Defendants argued that Dr. Wattanasuwan was a cardiologist, he saw Bray, read his chart, and had an opinion.  According to defendants, an adequate foundation existed because Dr. Wattanasuwan had the experience, training, and background to render an opinion.

The trial court sustained the objection on foundation grounds.  The court found the answer unresponsive as to Bray, because Dr. Wattanasuwan refused to answer as to Bray, and he made only general observations.

Dr. Wattanasuwan testified he was a cardiologist and was board certified in internal medicine, cardiovascular disease, and nuclear cardiology.   Dr. Wattanasuwan had brief contact with Bray when he performed the Persantine test on October 30.  He did not consider himself either a primary physician or a consultant.

Dr. Wattanasuwan determined Bray was a suitable candidate for the Persantine test.  To the best of his recollection, Bray was not receiving heparin during the test.

The first part of the test--the injection of an isotope and the monitoring of Bray--revealed no evidence of ischemia (reduced blood flow to the heart muscle).  Dr. Wattanasuwan testified that part of the test is not sensitive enough to detect coronary artery disease.  Dr. Wattanasuwan dictated his report at 9:04 a.m. on October 30, and it was typed by 12:56 p.m.  In addition to his formal dictated report, he also made a handwritten progress note in Bray's chart noting, "negative stress EKG".  Dr. Wattanasuwan also testified the Persantine test did not rule out significant coronary artery disease.

The second part of the test, the nuclear scan and imaging study, was interpreted and read by Dr. Puckett, a radiologist.  Dr. Wattanasuwan could not tell from the records when Dr. Puckett

dictated his report, but it was transcribed at 3:33 p.m. on October 30.

After reviewing the file, Dr. Wattanasuwan realized he had also read and interpreted Bray's echocardiogram performed on October 29, 2000, and November 1, 2000. The echocardiogram is a diagnostic test that uses ultrasound waves to create an image of the heart structure. In the October 29, 2000, echocardiogram report, Dr. Wattanasuwan noted the test showed aortic root dilation, some ventricular hypertrophy (increasing wall thickness), moderate calcific aortic stenosis (calcium deposit on his aortic valve), and a certain degree of narrowing. Along with the narrowing of the valve, Bray also had some mild leaking from the aortic, mitral, and tricuspid valves.

When asked if Bray had heart disease, Dr. Wattanasuwan testified Bray had "cardiovascular problems." He also believed it possible that Bray had active coronary artery disease.

### 8. Dr. David Henry Naour's Testimony

Dr. David Henry Naour testified he was a general surgeon. On October 31, 2000, Dr. Wiser asked Dr. Naour to see Bray and determine whether Bray needed surgery. According to Dr. Naour's progress note, Bray was suffering from more abdominal pain and severe hypotension (low blood pressure). Hypotension is consistent with bleeding but was also consistent with sepsis. Prior to surgery, Dr. Naour believed Bray might be suffering from aspiration pneumonia, pancreatitis, infarcted gut, acute cholecystitis (inflammation of the gallbladder), or acute cholangitis (infection of the bile duct).

Dr. Naour performed an exploratory laparotomy and found a large mass toward the back area of the abdominal area. He was concerned it might be bleeding. He referred to the mass as a spontaneous retroperitoneal hemorrhage or hematoma. He had seen other hematomas before but never in the retroperitoneal area.

Dr. Naour removed Bray's gallbladder but found no stones in the bile duct. He agreed that tissues near Bray's gallbladder were inflamed and that inflamed tissues had more of a tendency to break and bleed. He also agreed an ERCP carries a risk of bleeding. The type of bleeding he observed in Bray was a known complication of excessive use of heparin. Dr. Naour also believed a

retroperitoneal hemorrhage can occur without heparin. The bleed Dr. Naour observed extended from the area of the gallbladder down to the pelvic region, which was the area Dr. Wiser worked in.

**[The preceding material is nonpublishable under Supreme Court Rule 23.]**

### 9. Dr. Joseph Messer's Testimony

Dr. Joseph Messer testified as defendant's retained expert. He was a cardiologist in practice for 42 years and was familiar with the standards of care for cardiologists. Dr. Messer believed that "[c]linical judgment is by far the most important component in the proper management of a patient."

Dr. Messer testified that continuing heparin after the ERCP was within the standard of care. Bray had markers for an acute coronary syndrome (a blanket term used to cover a number of types of cardiac problems) and the heparin provided stability for that condition. At no time prior to Bray's respiratory arrest was heparin not needed. Moreover, Dr. Murphy did not deviate from the standard of care by decreasing heparin instead of discontinuing it when Bray's PTT level reached 150.

Dr. Messer believed the most likely cause of Bray's chest pain was coronary artery disease. Dr. Messer stated he was "rather proud" that he was the only physician who expressed the opinion that Bray probably had coronary artery disease. He did not believe that a significant retroperitoneal hemorrhage would have caused a myocardial infarction without the presence of significant coronary artery disease. Without an autopsy, he could not say whether acute coronary syndrome was ever ruled out.

According to Dr. Messer, the standard of care did not require Dr. Murphy to see Bray on October 30 because Dr. Wattanasuwan and Dr. Wiser saw Bray that day. Even if Murphy had seen him that day, he would not have seen any indication of bleeding.

Dr. Messer believed the monitoring and communication involved in Bray's care was proper. However, he agreed there had been inadequate communication between the physicians. Dr. Wiser should have contacted Dr. Murphy after the ERCP. Dr. Messer believed that Dr. Wiser ordering previous medications to resume after the ERCP constituted a new order. Dr. Messer agreed he

read Dr. Wiser's deposition and that Dr. Wiser had stated he was relying on the physicians from Illinois Heart to make decisions about the use or nonuse of heparin. Dr. Messer admitted that was appropriate. However, when asked whether he had any criticism of Dr. Wiser for relying on the Illinois Heart physicians to determine when to start and stop the heparin, Dr. Messer responded "except that he started it himself *** after the procedure."

Dr. Messer claimed retroperitoneal hemorrhages were very rare but do occur without the use of heparin. Without an autopsy, he could not be sure of the cause of Bray's retroperitoneal hemorrhage or what caused his death. Bray's high white-blood-cell count on October 31 was a strong indication of infection. When asked at trial whether heparin contributed to Bray's "demise," Dr. Messer stated he did not know and could not say with certainty. However, he admitted that at his deposition he testified that heparin "may well have contributed to Bray's demise."

When asked whether the standard of care required Dr. Murphy to know that Bray was on heparin, Dr. Messer testified "preferably." Dr. Messer admitted that despite all of Bray's medical problems, Dr. Murphy did not go see Bray until 11 a.m. on October 31. Dr. Messer admitted it was not acceptable at his hospital for a patient to go 27 hours without being seen by an attending physician. However, Dr. Messer disagreed that Bray went that length of time without being seen because Dr. Wiser and Dr. Wattanasuwan saw him.

### D. Jury-Instruction Conference

#### 1. Standard of Care Instruction

At the jury-instruction conference prior to trial, plaintiff offered Illinois Pattern Jury Instructions, Civil, No. 105.01 (2005) (hereinafter IPI Civil (2005)), the nonspecialist professional standard-of-care instruction. Defendants argued the appropriate standard of care was the cardiologist standard of care. Defendants tendered an instruction based on IPI Civil (2005) No. 105.02, the specialist professional standard of care. The trial court found the evidence undisputed that the standard of care as to the use of heparin is the same for specialists and nonspecialists. Therefore, the court found the nonspecialist standard of care applicable.

## 2. <u>Burden</u> of <u>Proof</u>

Defendants objected to plaintiff's jury instruction No. 17 on the burden of proof, which is based on IPI Civil (2005) No. B21.02.01 (negligence in cases with one plaintiff and more than one defendant).

**[The following material is nonpublishable under Supreme Court Rule 23.]**

"The plaintiff has the burden of proving each of the following propositions as to each defendant:

First, that the defendant acted or failed to act in one of the ways claimed by the plaintiff as stated to you in these instructions and that in so acting, or failing to act, the defendant was negligent;

Second, that Merle Bray was injured;

Third, that the negligence of the defendant was a proximate cause of the injury to Merle Bray.

You are to consider these propositions as to each defendant separately.

If you find from your consideration of all the evidence that any of the above propositions has not been proved as to each of the defendants, then your verdict should be for the defendants.  On the other hand, if you find from your consideration of all the evidence that all of the above propositions <u>have</u> <u>been</u> <u>proved</u> <u>as</u> <u>to</u> <u>any</u> <u>one</u> <u>of</u> <u>the</u> <u>defendants</u>, then your verdict should be for the plaintiff." (Emphasis added.)

**[The preceding material is nonpublishable under Supreme Court 23.]**

Defendants objected to plaintiff's instruction on the basis that the instruction must provide that if any one of the propositions has not been proved as to <u>any</u> defendant, the verdict should be for that defendant.  Defendants tendered their own proposed instruction based on B21.02 (negligence in cases with one plaintiff and one defendant).  **[The following material is nonpublishable under Supreme Court Rule 23.]** Defendants instruction provided, in pertinent part, as follows:

"If you find from your consideration of all the evidence that each of these

16

propositions has been proved then your verdict should be for that [p]laintiff.  On the other hand, if you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the [d]efendants."

**[The preceding material is nonpublishable under Supreme Court Rule 23.]**

The trial court accepted plaintiff's instruction.

### 3. <u>Verdict</u> <u>Form</u> <u>and</u> <u>Special</u> <u>Interrogatory</u>

Over defendants' objection, the verdict form tendered to the jury provided as follows:

"We, the jury find for Teresa Curi, as Administrator of the Estate of Merle Bray, Deceased, and against the following defendant or defendants:

Patrick B. Murphy, M.D.

as an agent of Illinois

Heart & Lung Associates,

S.C. a.k.a. Mid-Central

Cardiology, S.C.                         Yes __ No

Illinois Heart & Lung

Associates, S.C, a.k.a.

Mid-Central Cardiology, S.C.,

by and through its

other agents.                            Yes __ No __"

Over plaintiff's objection, the trial court tendered the following special interrogatory to the jury:

"The jury is instructed to answer the following interrogatory either 'yes' or 'no':

Did  Dr.  Patrick  B.  Murphy  possess

and

apply

‿ 17 ‿

the knowledge and use the skill and care ordinarily used by a reasonably well-qualified physician practicing under circumstances similar to

those

shown

by the

eviden

ce?

Answer:

If, and only if, you answer the above interrogatory in the negative, then you must answer the following interrogatory:

Was the professional negligence of the [d]efendant, Dr. Patrick B. Murphy, a proximate cause of the death of Merle Bray?

Answer: _____ "

## E. Verdict and Posttrial Proceedings

On March 25, 2000, the jury returned a verdict in favor of plaintiff and against (1) Dr. Murphy as an agent of Illinois Heart and (2) Illinois Heart by and through its other agents. The jury responded "no" to the first special interrogatory and "yes" to the second. The jury awarded damages totaling $1,439,824.

Defendant filed a posttrial motion seeking judgment notwithstanding the verdict or a new trial on liability, damages, or both. The trial court denied the motion, with the exception of an offset of $25,000 for the settlement plaintiff received from St. Joseph.

This appeal followed.

## II. ANALYSIS

On appeal, defendants argue (1) the trial court erred by refusing to give the specialist standard-of-care instruction, (2) the court erred by giving plaintiff's burden-of-proof instruction, (3) the court erred by excluding the testimony of Dr. Wattanasuwan concerning the appropriateness of heparin for patients such as Bray, and (4) the verdict was against the manifest weight of the evidence.

A. Jury-Instruction Issues

Defendants claim the trial court abused its discretion by giving (1) the nonspecialist standard-of-care instruction and (2) plaintiff's burden-of-proof instruction.

It is within the discretion of the trial court which jury instructions to give to the jury, and the court's decision will not be disturbed absent an abuse of that discretion. Schultz v. Northeast Illinois Regional Commuter R.R. Corp., 201 Ill. 2d 260, 273, 775 N.E.2d 964, 972 (2002). Whether a court abused its discretion depends on whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles. Schultz, 201 Ill. 2d at 273-74, 775 N.E.2d at 972-73. A jury instruction is justified if supported by some evidence in the record. Schuler v. Mid-Central Cardiology, 313 Ill. App. 3d 326, 336, 729 N.E.2d 536, 545 (2000). Reversal is warranted if the faulty jury instructions misled the jury and resulted in prejudice to the appellant. Schultz, 201 Ill. 2d at 274, 775 N.E.2d at 973.

1. Standard-of-Care Instruction

The central issue in a medical-malpractice action is the standard of care against which a doctor's negligence is judged. Moss v. Miller, 254 Ill. App. 3d 174, 185, 625 N.E.2d 1044, 1052 (1993). In this case, the trial court instructed the jury that, in providing professional services to Bray, "a physician must possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well-qualified physician practicing in the same or similar localities under the circumstances similar to those shown by the evidence." IPI Civil (2005) No. 105.01 (plaintiff's instruction No. 28). The court rejected the instruction tendered by defendants, which instructed that a physician who holds himself out as a specialist and provides services in his speciality is judged by the standards of a well-qualified specialist. See IPI Civil (2005) No. 105.02 (defendants' instruction No. 27).

Defendants do not dispute that the allegations regarding the misuse of heparin implicated a general standard of care. Instead, they argue that whether defendants were negligent in following Bray's progress can only be evaluated under a specialist professional standard of care. Defendant

presented testimony of two cardiologists while plaintiff presented the testimony of a retired gastroenterologist and a retired internal-medicine physician.

Defendants did not raise this argument below, either during the jury-instruction conference or in their posttrial motion. Consequently, they have forfeited this objection. See Einstein v. Nijim, 358 Ill. App. 3d 263, 275, 831 N.E.2d 50, 60 (2005) (failure to raise an issue in the trial court results in forfeiture of the issue).

Moreover, even if we were to consider the issue, the trial court did not abuse its discretion. In support of their position, defendants argue that Dr. Murphy was practicing cardiology when he treated Bray and Bray remained a cardiac patient throughout his stay. Defendants further argue that every cardiologist who testified at trial agreed the way Dr. Murphy followed Bray did not violate the applicable standard of care. Defendants' expert witness, Dr. Messer, a cardiologist, testified that he was familiar with the standard of care regarding cardiologists and testified the communications between Dr. Murphy and the other doctors and nurses did not violate the standard of care.

A jury instruction is justified if supported by the evidence. Schuler, 313 Ill. App. 3d at 336, 729 N.E.2d at 545. Here, the evidence did not justify the specialist standard-of-care instruction.

Defendants correctly note that Dr. Messer was a cardiologist and testified he was familiar with the cardiologist's standard of care. However, a close look at his testimony indicates he did not testify that a different standard of care applied to cardiologists as opposed to other physicians when it came to communications between the physicians. Dr. Messer testified that Dr. Murphy, Dr. Dhan, and Dr. Wattanasuwan's communications did not deviate from the standard of care. When asked whether a "reasonably prudent physician" would expect a nurse to communicate with him if a problem or issue arose during the care of Bray, he responded "absolutely." He was not asked, and did not testify, about what a cardiologist would expect or that a cardiologist would have a different expectation than a physician.

Similarly, when asked about communication between a "primary physician" and a

consultant, Dr. Messer testified that the consultant contacts the attending physician to tell him what was found. Again, no distinction was made between a physician and a cardiologist. When asked whether the standard of care would have required Dr. Murphy go back to see Bray when Bray was unavailable during Dr. Murphy's morning rounds on October 30, the standard mentioned is that of a physician, not a cardiologist.

On cross-examination, when asked whether, as an attending physician, the standard of care required Dr. Murphy know the medications a patient was on, Dr. Messer stated it would have been preferable. Further, Dr. Messer believed Dr. Wiser should have called Dr. Murphy after the ERCP. However, Dr. Messer agreed there was inadequate communication:

"Q. So you would agree there has been a failure of communication here amongst the physicians?

A. I would say there has been inadequate communication."

Clearly, Dr. Messer did not testify as to a different standard for cardiologists. The trial court did not abuse its discretion by denying the specialist standard-of-care jury instruction because the evidence did not support such an instruction.

### 2. Burden-of-Proof Instruction

Defendants argue the trial court also abused its discretion by giving plaintiff's burden-of-proof instruction rather that defendants' burden-of-proof instruction. Defendants claim plaintiff's instruction improperly allowed the jury to find against both defendants even if only Illinois Heart was negligent.

The trial court instructed the jury in relevant part as follows, with the portion to which defendants object emphasized:

"If you find from your consideration of all the evidence that any of the above propositions has not been proved as to each of the defendants, then your verdict should be for the defendants. On the other hand, if you find from your consideration of all the evidence that all of the above propositions have been proved as to any one

of the defendants, then your verdict should be for the plaintiff." (Emphases added.)

The IPI instruction on which plaintiff based her instruction provides as follows:

"If you find from your consideration of all the evidence that any of these propositions has not been proved as to [any one] [or more] [or all] of the defendant[s], then your verdict should be for [that] [those] defendant[s]. On the other hand, if you find from your consideration of all the evidence that all of these propositions have been proved as to [any one] [or more] [or all] of the defendant[s], then you must consider [that] [those] defendant['s][s'] claim[s] that the plaintiff was contributorily negligent." IPI Civil (2005) B21.02.01.

Defendants claim plaintiff's instruction was improper and misled the jury because it instructed the jury that a verdict against Illinois Heart would automatically justify a verdict against Dr. Murphy. Defendants further argue that because the instruction is peremptory, this court cannot examine the jury instructions as a whole to determine whether they fully and fairly apprise the jury of the relevant legal principles. See Schultz, 201 Ill. 2d at 273-74, 775 N.E.2d at 972-73 (reviewing court determines whether trial court abused its discretion by examining the jury instructions as a whole); Duffy v. Cortesi, 2 Ill. 2d 511, 516, 119 N.E.2d 241, 244 (1954) (holding that a peremptory instruction must contain all the facts and be complete within itself, and cannot be cured by other jury instructions). Defendants claim the instruction was peremptory because it directed the jury to return a verdict for plaintiff even if it only found Illinois Heart negligent.

The trial court did not abuse its discretion by giving plaintiff's instruction. The instruction was not peremptory. See, e.g., Martin v. Kralis Poultry Co., Inc., 12 Ill. App. 3d 453, 467, 297 N.E.2d 610, 620 (1973) (finding that an instruction that supports a verdict for the plaintiff if certain propositions are found and supports a verdict for the defendant if certain propositions are not found is not peremptory). Like the Martin case, plaintiff's instruction did not instruct the jury to return a verdict against both defendants even if it only found Illinois Heart liable. In fact, the verdict actually erroneously permits the jury to find for defendants even if only one defendant is found liable.

Plaintiff's instruction, consistent with IPI Civil (2005) No. B21.02.01, twice instructed the jury that it must consider the propositions as to each defendant separately. The instruction then informed the jury that if it found all of the propositions had been proved as to any one of the defendants, the verdict should be for plaintiff. The trial court gave the jury two verdict forms. The jury would use verdict form A if it found any of the defendants liable. Verdict form A then provided a space for the jury to find Dr. Murphy liable as an agent of Illinois Heart and/or Illinois Heart liable through the actions of agents other than Dr. Murphy. That is, the jury could find Illinois Heart liable through the acts of persons other than Dr. Murphy. The jury would use verdict form B if it found neither defendant liable. The language in IPI Civil (2005) No. B21.02.01 conformed with the two verdict forms. Consequently, the instruction contained a correct statement of the law.

Defendants argue on appeal that plaintiff's burden-of-proof instruction allowed the jury to find against both defendants even if only Illinois Heart were found negligent. The special interrogatory demonstrates the jury considered Dr. Murphy separately and found he failed to meet the standard of care and that his negligence was a proximate cause of Bray's death.

Notably, defendants' proposed instruction did not accurately state the law. See Lawler v. MacDuff, 335 Ill. App. 3d 144, 150, 779 N.E.2d 311, 317 (2002) (finding trial court did not abuse its discretion by declining to give the defendants' jury instruction because it did not accurately state the law). Defendants' instruction provided, in pertinent part, as follows:

"If you find from your consideration of all the evidence that each of these propositions has been proved then your verdict should be for that [p]laintiff. On the other hand, if you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the [d]efendants."

Defendants' instruction was based on IPI Civil (2005) No. 21.02, applicable to cases with one plaintiff and one defendant. Defendants' instruction failed to include the language directing the jury to consider the evidence as to each defendant separately. Moreover, it also provided that if any proposition were not proved, the verdict was for defendants, thereby treating defendants as one

entity rather than two.

At oral argument, we questioned whether defendants suffered any prejudice. Defendants argue on appeal that plaintiff's instruction prejudiced Dr. Murphy because it instructed the jury that a verdict against Illinois Heart automatically justified a verdict against Dr. Murphy. However, the verdict form listed as defendants (1) Dr. Murphy, as agent of Illinois Heart, and (2) Illinois Heart through the actions of other agents. The verdict form does not contain a place for the jury to even find Dr. Murphy personally or individually liable for his actions. According to the verdict form, only Illinois Heart was potentially liable--either through Dr. Murphy's actions or through the actions of other agents. Therefore, the instruction could not have prejudiced Dr. Murphy, who was not individually liable but was liable only as an agent of Illinois Heart.

The parties tendered, upon request, supplemental briefs on the issue. Both plaintiff and defendants assert that Dr. Murphy was sued individually and was found individually liable. Plaintiff argued Dr. Murphy was sued individually in a separate count and that the jury instruction identifying the parties lists "Patrick B. Murphy, M.D., as an agent of [Illinois Heart]," which plaintiff claims demonstrates he was a separate defendant. More compelling, however, is plaintiff's argument that defendants' special interrogatory, that asks about "Defendant, Dr. Patrick B. Murphy," with no qualifying or limiting language as to the capacity in which Dr. Murphy is sued:

"Did Dr. Patrick B. Murphy possess and apply the knowledge and use the

skill and care ordinarily used by a reasonably well-qualified physician practicing

under circumstances similar to those shown by the evidence?"

The jury response to the special interrogatory refutes defendants' claim that the jury could find against Dr. Murphy even if it only found Illinois Heart liable. In the special interrogatory, the jury clearly found Dr. Murphy negligent.

Finally, it is obvious from the transcript that the trial court and the parties held a jury-instruction conference off the record and later put their objections on the record. This artificial reconstruction of this procedure deprives the appellate court of a comprehensive review of the

instructions conference. We also recognize the regrettable shortage of court reporters in the system as the source of this problem, but the jury-instruction conference fails to contain explanations for some of the instructions given. In particular, this court is unsure why the count in the complaint against Dr. Murphy uses the term "agent," several jury instructions identify Dr. Murphy as agent, and the verdict form refers to Dr. Murphy "as agent." How this verdict against Dr. Murphy as agent of Illinois Heart could be enforced against Dr. Murphy individually mystifies this court even in the face of the parties' concession.

## B. Evidentiary Issues

Defendants also raise two evidentiary issues on appeal. First, defendants argue the trial court erred by excluding Dr. Wattanasuwan's testimony concerning the appropriateness of heparin for patients such as Bray. Second, defendants argue the jury's verdict was against the manifest weight of the evidence.

The discussion resolving these issues is nonpublishable under Supreme Court Rule 23.

**[The material in subheadings 1 and 2 is nonpublishable under Supreme Court Rule 23.]**

### 1. Dr. Wattanasuwan's Excluded Testimony

Defendants argue the trial court erred by excluding Dr. Wattanasuwan's testimony concerning the appropriateness of heparin for patients such as Bray. The court excluded the following question and answer:

"Q[. (Richard D. Stites, defense counsel)]: Doctor, do you have an opinion to a reasonable degree of medical certainty as to whether there was benefit in giving heparin to a patient such as Mr. Bray?

A[. (Craig Mannarino, plaintiff's counsel)]: I'm going to object to the form and foundation.

A[. (Dr. Wattanasuwan)]: I could not answer you directly to--about Mr. Bray. I could--because as I mentioned to you, that I'm not serving as a physician who know[s] him in all the aspect[s] to make a good judgment about his care. I could

answer you in general for the patient at this age present with some kind of presentation that's similar to him, has some cardiovascular pathology that [is] more or less similar to this case, I believe that, yes, there [is] a benefit of giving heparin to this group of patients. However, you need to keep in mind also that along with the great benefit came the great risk as well."

According to defendants, the trial court's ruling was directly at odds with the court's position regarding the standard-of-care instructions. The court accepted plaintiff's argument that the administration of heparin was within the knowledge of any general practitioner yet barred this testimony on the basis of insufficient foundation regarding the benefits of giving heparin to a patient such as Bray.

Defendants further argue the record contained ample foundation for Dr. Wattanasuwan's opinion. Dr. Wattanasuwan conducted tests on Bray, reviewed Bray's chart, and interpreted Bray's EKG and echocardiogram. Dr. Wattanasuwan also testified, without objection, to whether Bray had heart disease and was a suitable candidate for the Persantine test and that the tests showed no signs of ischemia. Dr. Wattanasuwan was sufficiently acquainted with Bray's condition to understand the condition of a hypothetical patient presenting with similar symptoms as those of Bray. Defendants assert the testimony was relevant to whether Dr. Murphy acted within the standard of care and its exclusion prejudiced them because administering heparin to a patient with symptoms similar to Bray was not as foolish as plaintiff wanted the jury to believe.

This court reviews a trial court's determination on the admission of expert testimony for an abuse of discretion. Martin v. Sally, 341 Ill. App. 3d 308, 315, 792 N.E.2d 516, 522 (2003). The admission of expert testimony requires the proponent of the evidence lay an adequate foundation establishing that the information upon which the opinion is based is reliable. Martin, 341 Ill. App. 3d at 315, 792 N.E.2d at 523. If the evidence does not show the existence of sufficient data on which a reasonable judgment may be based, the opinion is incompetent. See Continental Illinois National Bank v. Eastern Illinois Water Co., 31 Ill. App. 3d 148, 160, 334 N.E.2d 96, 107 (1975), quoting 32

C.J.S. Evidence §546(63), at 266-67 (1964).

Here, defendants failed to show the existence of sufficient data on which a reasonable judgment may be made. Dr. Wattanasuwan admitted he lacked sufficient information to determine whether heparin would have been beneficial for Bray. It only follows that if he did not have sufficient information with regard to Bray, he did not have enough information to make that determination for a "patient such as *** Bray." In fact, at one point during his testimony, Dr. Wattanasuwan testified that it would have been dangerous for him to do anything with respect to Bray's heparin because he did not know the patient well and had not had a chance to "thoroughly review, formulate, and make a good judgment." Moreover, defense counsel's hypothetical question did not set forth the facts on which the question was based. It was unclear what a person "like Bray" meant. On this record, the trial court did not abuse its discretion by striking the testimony.

## 2. Sufficiency of the Evidence

Defendants last argue that the trial court erred by denying their posttrial motion for a new trial because the jury's verdict was against the manifest weight of the evidence.

A reviewing court will not reverse a trial court's ruling on a motion for a new trial unless the trial court abused its discretion. McClure v. Owens Corning Fiberglas Corp., 188 Ill. 2d 102, 132-33, 720 N.E.2d 242, 257 (1999). In reviewing the trial court's ruling, this court must consider that a new trial is granted only when the jury verdict is against the manifest weight of the evidence. Jones v. Chicago Osteopathic Hospital, 316 Ill. App. 3d 1121, 1125, 738 N.E.2d 542, 547 (2000). A verdict is against the manifest weight of the evidence only where the opposite conclusion is clearly evident or where the jury's findings appear unreasonable, arbitrary, or not based on the evidence. Jones, 316 Ill. App. 3d at 1125, 738 N.E.2d at 547.

To prove negligence in a medical-malpractice action, plaintiff was required to show that the proper standard of care against which Dr. Murphy's conduct was measured, an unskilled or negligent failure to comply with that standard of care, and a resulting injury proximately caused by the lack of skill or care. See Garley v. Columbia LaGrange Memorial Hospital, 351 Ill. App. 3d 398,

404, 813 N.E.2d 1030, 1036 (2004).  Defendants argue they presented substantial evidence of the need for and proper administration of heparin in patients presenting with Bray's symptoms. Defendants also claim the testimony of Dr. Murphy, Dr. Wattanasuwan, Dr. Messer, and Dr. Dhan established no violation of the standard of care with respect to the administration of heparin or with the communications between the physicians.

Defendants essentially ask this court to reweigh the evidence.  Where conflicting expert testimony is presented, the jury resolves the conflict.  Dabros v. Wang, 243 Ill. App. 3d 259, 264, 611 N.E.2d 1113, 1117 (1993).  This court will not reweigh the evidence or reevaluate the credibility of witnesses.  Dabros, 243 Ill. App. 3d at 264, 611 N.E.2d at 1117.

The jury's verdict was not against the manifest weight of the evidence.  Dr. Ramsey also testified that Dr. Murphy did not comply with the standard of care for a reasonably well-qualified physician in his care and treatment of Bray.  Dr. Ramsey testified Dr. Murphy violated the standard of care by not discontinuing the heparin when he became aware of the results of the cardiac tests on October 30 and there was no longer any indication for it use.  He also breached the standard of care when he failed to discontinue the heparin after Bray's PTT rose to the toxic level of 150. Besides the administration of heparin, there was a lack of communication in the 36 hours from when Bray was admitted as an emergency until he was finally seen by the attending physician on Tuesday morning.

Dr. Murphy testified that he should have known his patient was on heparin.  While equivocal on the question of when coronary artery disease was ruled out, the jury was entitled to believe Dr. Murphy's testimony that Bray would not have had the ERCP if the physicians were still concerned about acute myocardial infarction or coronary artery disease.  Moreover, Dr. Murphy admitted no compelling reason existed for Bray to be on heparin the morning of October 31.  The jury was entitled to disbelieve Dr. Messer's testimony that Bray suffered from coronary artery disease justifying the continued use of heparin.  The jury was also entitled to disregard Dr. Dhan's testimony that a cardiac condition still existed.

Dr. Blackstone testified that Dr. Murphy breached the standard of care because once Bray had a negative Persantine test, no indication for the use of heparin existed. Even Dr. Dhan testified he did not intend for Bray to receive heparin forever but only until the cardiac condition was ruled out.

The jury heard evidence that Bray's retroperitoneal bleed occurred in the same area where the ERCP procedure was performed. Even Dr. Murphy agreed that heparin may have contributed to Bray's death.

In summary, the evidence supported a conclusion that Bray's pain was caused by gallstones and/or common-bile-duct stones, his cardiac condition had been ruled out by October 30, and no further indication for heparin existed. The evidence further supports a conclusion that the heparin contributed to Bray's death. Because of the inability of Bray's blood to clot, he suffered from a retroperitoneal hemorrhage resulting in huge blood loss and organ failure. Because the jury's verdict was not against the manifest weight of the evidence, the trial court did not abuse its discretion by denying defendants' motion for a new trial.

**[The preceding material is nonpublishable under Supreme Court Rule 23.]**

### III. CONCLUSION

Therefore, for the reasons stated herein, we affirm the trial court's judgment.

Affirmed.

TURNER, P.J., and KNECHT, J., concur.