**FIRST DIVISION**
**DECEMBER 04, 2006**

No. 1-04-1243

| | | |
|---|---|---|
| HAROLD MANSMITH, Individually, and as | ) | Appeal from the |
| Special Administrator of the Estate | ) | Circuit Court of |
| of Delphine Mansmith, Deceased, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No.  99 L 13912 |
| | ) | |
| | ) | |
| ANJUM HAMEEDUDDIN, | ) | The Honorable |
| | ) | John Grogan, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE GARCIA delivered the opinion of the court.

On January 14, 1998, Delphine Mansmith died of a brain stem abscess caused by an acute staph infection that developed after she received an epidural steroid injection for back pain.  Her husband, the plaintiff Harold Mansmith, sued the defendant, Anjum Hameeduddin, M.D., and R. Lawrence Ferguson, M.D. for medical malpractice.  The plaintiff and Dr. Ferguson reached a settlement agreement before the jury reached its verdict.  A jury found for the plaintiff and awarded damages in the amount of $1,198,734.94.  After a setoff in the amount paid by Dr. Ferguson of $750,000,

judgment was entered against Dr. Hameeduddin in the amount of $448,734.94.

On appeal, Dr. Hameeduddin argues that the trial court erred when it denied her pretrial motion for summary judgment, her motions for a directed verdict at the close of the plaintiff's case in chief and at the close of all of the evidence, and her posttrial motion for judgment notwithstanding the verdict because the plaintiff did not prove she deviated from the standard of care and did not and could not prove that she was the proximate cause of Mrs. Mansmith's pain and suffering and ultimate death under both survival and wrongful death causes of action. She also contends that the trial court erred when it (1) refused to instruct the jury that Dr. Ferguson reached a settlement agreement with the plaintiff and (2) taxed the costs of Dr. Ferguson's videotaped evidence deposition to her. For the reasons that follow, we affirm in part and vacate in part the judgment of the trial court.

BACKGROUND

Dr. Hameeduddin was Mrs. Mansmith's primary care physician. Mrs. Mansmith was an insulin-dependent diabetic and obese. In February 1996, Mrs. Mansmith first complained of back pain. Dr. Hameeduddin prescribed conservative treatment, which consisted of back exercises, injections of DepoMedrol for pain, and physical

2

therapy.  By June 1996, Mrs. Mansmith's pain returned, and she experienced numbness in her left leg and had difficulty walking. Dr. Hameeduddin ordered an MRI scan for Mrs. Mansmith.  The MRI report dated June 28, 1996, stated that Mrs. Mansmith had a small focal herniation at the L5-S1 vertebra, a large left lateral bulge at the L4-L5 vertebrae, and a mild bulge at L1-L2.

Dr. Hameeduddin referred Mrs. Mansmith to Dr. R. Lawrence Ferguson, a neurosurgeon.  In August 1996, after examining Mrs. Mansmith, Dr. Ferguson diagnosed her with spinal stenosis[1] and a bulging disc at the L4-L5 vertebrae.  Dr. Ferguson recommended surgery.  Specifically, he recommended that Mrs. Mansmith undergo a decompressive laminectomy[2] to remove the bulging disc at the L4-L5 area of her spine.  While the surgery would not necessarily alleviate Mrs. Mansmith's back pain, it would help relieve the numbness in her leg.  Prior to surgery, Dr. Hameeduddin prepared

---

[1] Spinal stenosis is a condition that causes bone deformity, which results in a narrowing of the spaces in the spine.  This condition can pinch nerves extending from each vertebra, or pinch the spinal cord, causing pain.

[2] A laminectomy is a surgical procedure in which a surgeon removes part of the vertebra, creating more room for the spinal cord or the nerves.

Mrs. Mansmith's preoperative history, which detailed she had spinal stenosis at the L4-L5 area.

On August 12, 1996, Dr. Ferguson performed surgery on Mrs. Mansmith. Instead of operating at the L4-L5 level, he performed the laminectomy at the L1-L3 level. In essence, Dr. Ferguson left untreated the stenosis and bulging disc at the L4-L5 level. In his postoperative report, which he sent to Dr. Hameeduddin, Dr. Ferguson stated that he performed the laminectomy at the L4-L5 level. Following surgery, Mrs. Mansmith was treated by both Drs. Hameeduddin and Ferguson for a postsurgical wound infection. By December 1996, the infection had healed.

In April 1997, Mrs. Mansmith again complained of lower back pain and pain radiating down her left leg. Once again, Dr. Hameeduddin prescribed physical therapy. Although her pain subsided for a time, by August 1997, Mrs. Mansmith was in excruciating pain with numbness in her lower extremities. Because she was not responding to conservative treatment, Dr. Hameeduddin ordered a second MRI. The MRI report received by Dr. Hameeduddin showed that Mrs. Mansmith had surgery at the L1-L3 vertebrae. It also showed that the presurgery pathology, the spinal stenosis and bulging disc at the L4-L5 vertebrae, remained unchanged. Dr. Hameeduddin recognized the inconsistencies between Dr. Ferguson's postoperative report and the second MRI,

but she did not inform Dr. Ferguson or Mrs. Mansmith about those inconsistencies. Dr. Hameeduddin explained:

> "At that point, I was not aware of what had exactly happened. I'm not a surgeon; I'm not a radiologist. I looked at the report and I - - I reviewed the operative report again and it was very confusing because the operative report did say that the patient was operated on L5, S1."

Mrs. Mansmith indicated that she did not want to go back to Dr. Ferguson and the Mansmiths requested a referral for a second opinion; Dr. Hameeduddin referred Mrs. Mansmith to Dr. George Miz, an orthopedic surgeon. In the course of her referral of Mrs. Mansmith to Dr. Miz, Dr. Hameeduddin provided only the second MRI scan report and film; Dr. Hameeduddin did not forward to Dr. Miz the report of the first MRI scan (presurgery) showing stenosis at the L4-L5 level; nor did Dr. Hameeduddin forward Dr. Ferguson's postoperative report in which he wrongly stated that he performed the laminectomy at the L4-L5 level.

Based on his review of the second MRI report, Dr. Miz recommended that Mrs. Mansmith lose weight and that she receive an epidural steroid injection, so long as she did not have an infection in her spine. He did not recommend surgery because

**5**

Mrs. Mansmith had undergone a laminectomy at L1-L3 by Dr. Ferguson the previous year and he wanted to attempt conservative treatment first. If, however, the epidural did not relieve Mrs. Mansmith's pain, Dr. Miz would have considered surgery.

In correspondence dated August 28, 1997, to Dr, Hameeduddin, Dr. Miz stated, "Her lumbar MRI scan we reviewed and shows evidence of previous decompression from L1 to L3. *** At L4-L5, she has significant residual central spinal canal stenosis." In correspondence dated October 7, 1997, to Dr. Hameeduddin, Dr. Rene Santos, an infectious disease specialist who examined Mrs. Mansmith for infections before the epidural steroid injection was administered, stated, "She underwent a lumbar laminectomy (L1-L3) by Dr. Ferguson last year for diskitis and spinal stenosis."

On December 23, 1997, Dr. Holly Carobene, an anesthesiologist and pain management specialist, administered the epidural steroid injection. In early January, Mrs. Mansmith complained of severe headache and back pain. On January 14, 1998, Mrs. Mansmith died from an acute staph infection. The epidural injection introduced bacteria into Mrs. Mansmith's spinal canal, which, after it reached her brain, caused a brain stem abscess that killed her. The initial autopsy indicated only that Mrs. Mansmith died as a result of a brain stem abscess. An exhumation performed in April 2002 showed that the brain stem

1-04-1243

abscess was caused by bacteria introduced during the epidural steroid injection.

In December 1999, the plaintiff sued Dr. Hameeduddin for medical malpractice pursuant to the Survival Act (755 ILCS 5/27-6 (West 1998)), and wrongful death pursuant to the Wrongful Death Act (740 ILCS 180/0.01 et seq. (West 1998)).[3]  In his third amended complaint, which was based on the autopsy, the plaintiff alleged that Dr. Hameeduddin breached her duty of care in that she did not tell Mrs. Mansmith that she had a vertebral bone infection.

In June 2003, Dr. Hameeduddin filed a motion for summary judgment, arguing that no evidence in the record existed to support the claims that (1) any of her acts or omissions were the proximate cause of Mrs. Mansmith's death or (2) that her failure to report impacted Mrs. Mansmith's subsequent treatment.  Later that month, the plaintiff filed a motion for leave to amend his third amended complaint to correspond to the exhumation report,

---

[3] The plaintiff also sued Drs. Ferguson, Santos, and Gilbert.  Drs. Santos and Gilbert were voluntarily dismissed before the plaintiff filed his fourth amended complaint.  Dr. Ferguson reached a settlement agreement with the plaintiff while the jury was deliberating.

which the trial court granted. In the fourth amended complaint, the plaintiff specifically alleged: (1) Dr. Hameeduddin did not inform Mrs. Mansmith or Dr. Ferguson, or the other physicians, that Dr. Ferguson had intended to, but did not, operate on the L4-L5 vertebrae and (2) had Mrs. Mansmith been informed of the mistake, she would have gone to the University of Chicago medical centers for the surgery and would not have agreed to an epidural steroid injection. On July 31, 2003, the trial court denied Dr. Hameeduddin's motion for summary judgment, treating the motion as if it related to the fourth amended complaint.

At trial, Dr. Larry Lustgarten, plaintiff's retained neurosurgeon, opined that if Dr. Ferguson had performed Mrs. Mansmith's surgery at the L4-L5 vertebrae, Mrs. Mansmith would not have needed the epidural steroid injection that caused her death. However, he testified that in Mrs. Mansmith's case, an epidural steroid injection was appropriate and that its administration was within the standard of care. He opined that it was appropriate for a family practitioner, like Dr. Hameeduddin, to defer to a specialist about orthopedic and neurological issues. He also testified that a person could get an infection from an epidural injection even with the best care.

Dr. Finely Brown, plaintiff's retained family practice expert, opined that Dr. Hameeduddin violated the standard of care

**8**

by not telling Mrs. Mansmith that Dr. Ferguson operated on the wrong vertebrae, and by not coordinating her care with him and letting Dr. Ferguson know that he operated on the wrong level. Dr. Brown explained that when a primary care practitioner discovers an inconsistency between what a surgeon says he did and what that surgeon actually did, the practitioner must do two things: (1) ask the surgeon to resolve the discrepancy, and (2) inform his patient of the discrepancy. Because Mrs. Mansmith did not know that Dr. Ferguson operated on the wrong level, Dr. Brown opined that she could not seek appropriate medical treatment and was exposed to an unreasonable risk associated with receiving the epidural steroid injection. In Dr. Brown's opinion, Dr. Hameeduddin's failure to inform Mrs. Mansmith of the discrepancy between what Dr. Ferguson said he did and what he actually did, proximately caused her pain and suffering, and her death.

Dr. Ferguson's videotaped evidence deposition testimony was played for the jury. He testified that he operated on a level different from what he intended. Although Mrs. Mansmith's pathology did not change, she did have some improvement in her symptoms following the surgery. Dr. Ferguson testified that he did not agree with the use of the epidural steroid injection because Mrs. Mansmith had a compressive lesion, she was diabetic, and she had a previous infection in the area of the first

**9**

surgery. If Mrs. Mansmith had returned to his care, he would have suggested that she have further surgery on the L4-L5 level. He opined that surgery was better for Mrs. Mansmith because the surgery would have decompressed her nerve roots, which caused her pain and numbness. Although he recognized that the rate of infection for surgery and epidural steroid injections was approximately the same, he explained that the infections were different. An infection resulting from a surgery would be superficial, while an infection from an injection would be deep.

Dr. Charles Fager, an expert in neurosurgery retained by Dr. Ferguson, testified that in his opinion, the epidural steroid injection should never have been given. He explained that he never has had faith in such injection for any condition, he never would have considered giving it, and giving it was a clear deviation from the standard of care.

Dr. Hameeduddin opined that she complied with the standard of care in treating Mrs. Mansmith. As a family practitioner, she referred Mrs. Mansmith to specialists for all of her complaints. She admitted that if she became aware that a specialist had improperly or negligently treated her patient, she would have a duty to tell the patient. When asked what her duty, as a family practitioner, was when she received the second MRI report, she stated: "To render her the proper care and send her to the

appropriate surgeon to have it reviewed to find out what was still causing her pain." Dr. Hameeduddin also admitted that she knew there was an inconsistency between the postoperative report and the second MRI, but that she did not tell Mrs. Mansmith or Dr. Ferguson about the inconsistencies. She opined that the treatment that she provided Mrs. Mansmith did not cause her injury or death. She testified that in her opinion she did not deviate from the standard of care and nothing she did contributed to Mrs. Mansmith's pain or contributed to her need for the epidural steroid injection that killed her.

Dr. Steven Eisenstein, a family practitioner, testified as an expert witness for Dr. Hameeduddin. Dr. Eisenstein testified that for complaints of back pain, the family practitioner must assess the problem and decide on treatment. Because back pain is a common problem, family practitioners generally manage the pain through outpatient or conservative treatment and make referrals to specialists if the problem persists. Dr. Eisenstein opined that Dr. Hameeduddin complied with the standard of care in treating Mrs. Mansmith's back pain. He also testified that following Mrs. Mansmith's surgery, it was appropriate for Dr. Hameeduddin to prescribe conservative treatment and that her postoperative care for Mrs. Mansmith's back pain was appropriate and within the standard of care. When asked what Dr.

**11**

Hameeduddin's duty to Mrs. Mansmith was after receiving the second MRI report, Dr. Eisenstein testified that "[s]he was required to inform the patient that the MRI revealed abnormalities and that she felt these were significant enough that surgical consultation was necessary." Dr. Eisenstein testified that the standard of care did not require Dr. Hameeduddin to discuss the inconsistencies between the MRIs with Dr. Ferguson "[b]ecause the MRI was ordered with the specific idea that this patient had pain and we were trying to get her better." Dr. Eisenstein opined that nothing Dr. Hameeduddin did contributed to Mrs. Mansmith's death.

Following the plaintiff's case-in-chief and again at the close of all of the evidence, Dr. Hameeduddin moved for a directed verdict. She argued that there was no evidence she deviated from the standard of care or that her actions or omissions were a proximate cause of Mrs. Mansmith's death because there was no evidence that if Mrs. Mansmith had known about the inconsistencies, she would have done anything differently. The trial court denied the motions.

After the jury was instructed and had begun its deliberations, Dr. Ferguson and the plaintiff reached a settlement agreement. Dr. Hameeduddin asked the court to give the jury Illinois Pattern Jury Instructions, Civil, No. 2.03,

**12**

(2000) (hereinafter IPI Civil (2000) No. 2.03), which stated: "R. Lawrence Ferguson, M.D. is no longer a party to this case. You should not speculate as to the reason nor may the remaining parties comment on why R. Lawrence Ferguson, M.D. is no longer a party." The plaintiff argued that the instruction was only appropriate where the parties made comments during closing arguments about the fact that the party that settled is no longer present. The trial court refused to issue the instruction, in part, because "the jury had been deliberating for a substantial period of time, and the court did not want to put the emphasis on the case against Dr. Hameeduddin at the time even though Dr. Hameeduddin's attorneys tendered." The trial court did instruct the jury that each defendant was entitled to a fair consideration of his or her own defense, and each defendant's case was to be decided as if it were a separate lawsuit. Also, the trial court instructed the jury to answer a special interrogatory which asked whether the epidural steroid injection performed by Dr. Carobene was the sole proximate cause of the death of Mrs. Mansmith.

The jury returned a verdict in favor of the plaintiff and against Dr. Hameeduddin and Dr. Ferguson in the amount of $1,198,734.94. The amount of the verdict was reduced by the amount of Dr. Ferguson's negotiated settlement, $750,000. Dr. Hameeduddin filed a posttrial motion for judgment notwithstanding

**13**

the verdict or, in the alternative, a new trial. The trial court denied the motion, explaining, "It would appear that the failure to so inform either the plaintiff or Dr. Ferguson depriving [Mrs. Mansmith] of the ability to be informed as to [the] status of her back condition was a question of fact for the jury to determine. They determined."

In April 2004, the trial court granted the plaintiff's motion for the assessment of costs. Specifically, the plaintiff sought to recover the cost associated with Dr. Ferguson's videotaped evidence deposition. The court awarded the plaintiff $1,009.55 in costs against Dr. Hameeduddin for the deposition. On April 27, 2004, Dr. Hameeduddin filed her timely notice of appeal.

ANALYSIS

On appeal, Dr. Hameeduddin argues that she did not deviate from the standard of care in treating Mrs. Mansmith and, in any event, nothing she did was the proximate cause of Mrs. Mansmith's pain and suffering and ultimate death. She therefore contends that the trial court erred when it denied her motion for summary judgment, motions for directed verdict, and motion for judgment notwithstanding the verdict. She also argues that the trial court erred in refusing to give IPI Civil (2000) No. 2.03 and assessing to her the costs of Dr. Ferguson's videotaped evidence

**14**

1-04-1243

deposition.

A. Summary Judgment

The denial of Dr. Hameeduddin's motion for summary judgment is not subject to review on appeal. Where the issue in the motion is decided at trial, any error in the denial merges into the judgment. Nilsson v. NBD Bank of Illinois, 313 Ill. App. 3d 751, 767, 731 N.E.2d 774 (1999).

B. Motions for Directed Verdict and Motion for Judgment n.o.v.

Following the plaintiff's presentation of evidence and again at the close of all of the evidence, Dr. Hameeduddin moved for a directed verdict, arguing that evidence was lacking that she deviated from the standard of care or that her actions or omissions were a proximate cause of Mrs. Mansmith's injury and death. The trial court denied the motions. In this appeal, Dr. Hameeduddin argues that the plaintiff failed to establish that the treatment she provided Mrs. Mansmith deviated from the standard of care and that the plaintiff failed to establish causation because Dr. Brown could only speculate as to what actions Mrs. Mansmith would have taken had she been informed that Dr. Ferguson operated on the wrong vertebrae.

"As in other negligence cases the question of whether the doctor deviated from the standard of care and whether his conduct was a proximate cause of the plaintiff's injury are questions of

**15**

fact for the jury.  Under the established Pedrick criteria, judgment should not here be entered for the defendant[] unless all of the evidence viewed in the aspect most favorable to the plaintiff so overwhelmingly favors the defendant[] that no contrary verdict based on the evidence could ever stand." Borowski v. Von Solbrig, 60 Ill. 2d 418, 423, 328 N.E.2d 301 (1975), citing Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967).

A directed verdict or a judgment n.o.v. should not be granted if "'"reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented"'. [Citation.] 'In making this assessment, a reviewing court must not substitute its judgment for the jury's, nor may a reviewing court reweigh the evidence or determine credibility of the witnesses.' [Citation.]"  Moller v. Lipor, Nos. 1-04-3640, 1-05-0061 cons., slip op. at 11 (September 29, 2006).  In other words, a motion for directed verdict or judgment n.o.v. should not be granted where the evidence demonstrates a substantial factual dispute or where the witnesses's credibility is at issue.  Our review of this issue is de novo.  Schiff v. Friberg, 331 Ill. App. 3d 643, 657, 771 N.E.2d 517 (2002).

### 1.  Standard of Care

"The central issue in a medical-malpractice action is the

**16**

standard of care against which a doctor's negligence is judged." Curi v. Murphy, 366 Ill. App. 3d 1188, 1199, 852 N.E.2d 401 (2006). It is the plaintiff's burden to prove by a preponderance of the evidence that the defendant deviated from that standard of care. Borowski, 60 Ill. 2d at 423. A deviation from the standard of care constitutes professional negligence, which must be proved by expert testimony. Borowski, 60 Ill. 2d at 423; IPI Civil (2000) No. 105.02.

Dr. Brown, as the plaintiff's family practitioner expert, testified that under the standard of care applicable to a primary care practitioner, Dr. Hameeduddin was required to inform her patient that Dr. Ferguson operated at the wrong level. The standard of care also required Dr. Hameeduddin to coordinate her care of Mrs. Mansmith with Dr. Ferguson and, therefore, Dr. Hameeduddin had a duty to inform Dr. Ferguson that he had performed the surgical operation at the wrong level. In effect, Dr. Hameeduddin had a medical duty to resolve the inconsistency between the second MRI report that showed stenosis at the L4-L5 vertebrae and Dr. Ferguson's postoperative report claiming that he performed a laminectomy at that very level.

Before the jury, Dr. Hameeduddin testified that the conclusions contained in the two reports were "confusing," making her "[un]aware of what had happened." Dr. Hameeduddin admitted

**17**

during cross-examination, however, that if she became aware that a specialist had negligently treated her patient, she would have a duty to tell the patient. Dr. Brown testified that Dr. Hameeduddin deviated from the standard of care by failing to act to correct her "confusion"; that is, failing to resolve the "inconsistency" between the second MRI report showing the same pathology Mrs. Mansmith had presurgery and Dr. Ferguson's postoperative report in which he stated he successfully addressed that pathology during the laminectomy.

Based on the conflicting testimony of Dr. Brown and Dr. Hameeduddin as to when a duty to disclose to a patient is triggered, the question before the jury was whether, under the circumstances shown by the evidence, an <u>inconsistency</u> or <u>surgical negligence</u> by Dr. Ferguson was demonstrated by the August 1997 MRI report in light of Dr. Ferguson's postoperative report. Based on the testimony of Dr. Eisenstein and Dr. Hameeduddin, the jury was free to determine that an "inconsistency" was insufficient to trigger a duty on the part of Dr. Hameeduddin to discuss the results of 1997 MRI and Dr. Ferguson's postoperative findings with Mrs. Mansmith. If, however, the evidence established professional negligence on the part of Dr. Ferguson, then, based on Dr. Hameeduddin's own testimony, she was required to tell Mrs. Mansmith of Dr. Ferguson's negligence.

**18**

The record establishes that Mrs. Mansmith remained Dr. Hameeduddin's patient through at least January 2, 1998, when she saw her last at an office visit.  There is no dispute that at no time did Dr. Hameeduddin disclose to Mrs. Mansmith the evidence of Dr. Ferguson's possible professional negligence during the 1996 laminectomy.  Yet, Dr. Hameeduddin received medical corroboration of the accuracy of the August 1997 MRI film and report.  Dr. Miz saw Mrs. Mansmith on August 28, 1997, and reviewed the August 1997 MRI film and report.  In his correspondence to Dr. Hameeduddin, Dr. Miz related that Mrs. Mansmith underwent a laminectomy between the L1 and L3 vertebrae, that she had significant spinal stenosis at L4-L5, and she was suffering excruciating pain, rated at 10 on a scale of zero to 10.  Also, Dr. Santos saw Mrs. Mansmith in October 1997.  In his correspondence to Dr. Hameeduddin, he stated that since her prior 1996 MRI scan, Mrs. Mansmith had undergone a laminectomy at L1 through L3.

Based on this evidence, even if professional negligence of Dr. Ferguson had to be shown to trigger the duty Dr. Hameeduddin admits she had to discuss this with Mrs. Mansmith, we find more than sufficient evidence for the jury to conclude that the higher showing was met.  It was within the jury's prerogative to conclude that Dr. Hameeduddin had a continuing duty to discuss

**19**

with Mrs. Mansmith what amounted to substantial evidence of the same pathology that existed presurgery in 1996, in direct conflict with Dr. Ferguson's claim that he performed the laminectomy as he had intended. Based on this evidence, the jury was free to conclude that Dr. Ferguson's professional negligence should have been known to Dr. Hameeduddin, if not by August 1997, when she received both the second MRI report and the report from Dr. Miz, an orthopedic surgeon, a specialist on par with Dr. Ferguson, a neurosurgeon, then certainly by October 1997 when Dr. Santos sent Dr. Hameeduddin his report. Thus, this knowledge should have triggered Dr. Hameeduddin's duty to discuss Dr. Ferguson's surgical negligence with Mrs. Mansmith.

We find the evidence in the record regarding the standard of care and of Dr. Hameeduddin's deviation from that standard of care to be more than sufficient to withstand her motions for directed verdict and judgement n.o.v. While the evidentiary showing that Dr. Hameeduddin elected to treat Mrs. Mansmith without addressing her confused reaction to the second MRI and Dr. Ferguson's postoperative report may not have been sufficient to meet the plaintiff's burden as to a deviation of the applicable standard of care, the additional evidence on this point while Dr. Hameeduddin remained Mrs. Mansmith's primary care physician was more than sufficient to make this a jury question.

**20**

The evidence is undisputed that at no time after the receipt of medical reports corroborating the second MRI results did Dr, Hameeduddin ever discuss with Mrs. Mansmith these finding in relation to Dr. Ferguson's postoperative report stating that he had performed a laminectomy at the L4-L5 level, even though this duty continued through January 1998.

Accordingly, we reject Dr. Hameeduddin's claim that there was no evidence that she deviated from her standard of care in treating Mrs. Mansmith after the surgical operation performed by Dr. Ferguson and before Mrs. Mansmith received the epidural injection. Also, based on the record, it is without contention that of all the medical professions involved with the treatment and care of Mrs. Mansmith, only Dr. Hameeduddin was sent and received the reports clearly establishing that Dr. Ferguson performed the surgery on the wrong level and Mrs. Mansmith, at the time of the epidural steroid injection, still suffered from the same pathology for which she had agreed to undergo elective surgery. As Dr. Hameeduddin testified herself, she had a duty to inform her patient of negligent medical care provided by a specialist to whom she had referred a patient. The record is clear that Dr. Ferguson did just that and that Dr. Hameeduddin had clear evidence of that negligence prior to the second surgical operation Mrs. Mansmith underwent in December 1997. The

record evidence was sufficient that Dr. Hameeduddin failed in fulfilling her duty to her patient.  The record further establishes that Mrs. Mansmith died without ever having been informed that the first surgery she agreed to undergo to alleviate her pain and numbness was incorrectly performed.

In sum, the evidence clearly supports the jury's finding that Dr. Hameeduddin had a duty to inform Mrs. Mansmith of Dr. Ferguson's negligence during the first operation and that her care of Mrs. Mansmith deviated from that standard.  See Gee v. Treece, 365 Ill. App. 3d 1029, 1035, 851 N.E.2d 605 (2006) (whether defendant doctor "was negligent for failing to [properly treat and care for the patient] in light of the information he had to work with" was for the jury to determine).  While Dr. Hameeduddin claims that her duty to Mrs. Mansmith was satisfied by the referral of Mrs. Mansmith to specialists after the receipt of the August 1997 MRI, a contention supported by her expert, we cannot say that her duty ended there in the face of reports from three physicians that stenosis existed as it did prior to Dr. Ferguson's surgical operation.  In particular, where the record evidence reveals that Dr. Hameeduddin was the only physician that had reviewed the conflicting MRI scans (1996 and 1997) and Dr. Ferguson's postoperative report, the burden to have passed on Dr. Ferguson's postoperative report to the other specialists was

**22**

slight. Passing on Dr. Ferguson's report might well have provided the cover she claims here of deferring to a specialist. But having failed to do that, there was sufficient evidence to allow the jury to determine that what Dr. Hameeduddin did not do, was a deviation of the standard of care she owed to Mrs. Mansmith.

It is against this backdrop that we examine whether Dr. Hameeduddin's deviation from the standard of care was a proximate cause of the pain and suffering Mrs. Mansmith endured following Dr. Ferguson's negligent operation and Mrs. Mansmith's death arising from the epidural injection.

## 2. Proximate Cause

The expression "proximate cause" means "a cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause." IPI Civil (2000) No. 15.01. Proximate cause is to be determined from all the attending circumstances, and "'it can only be a question of law when the facts are not only undisputed but are also such that there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them.'" Seef v. Ingalls Memorial Hospital, 311 Ill. App. 3d 7, 19, 724 N.E.2d 115 (1999), quoting Merlo v. Public Service Co., 381 Ill. 300, 318, 45 N.E.2d 665 (1942). "The plaintiff need not show a

better result would have been obtained absent the doctor's alleged negligence in order to establish proximate cause." Sinclair v. Berlin, 325 Ill. App. 3d 458, 464, 758 N.E.2d 442 (2001).

Based on the cases each side cites in support of their respective positions, opposing doctrines are offered to assist us in analyzing the proximate cause issue here. Dr. Hameeduddin contends that this case should be analyzed under the "loss of chance" theory, citing Scardina v. Nam, 333 Ill. App. 3d 260, 775 N.E.2d 16 (2002), and Aguilera v. Mt. Sinai Hospital Medical Center, 293 Ill. App. 3d 967, 691 N.E.2d 1 (1997). The plaintiff, on the other hand, cites to an "informed consent" case, Coryell v. Smith, 274 Ill. App. 3d 543, 653 N.E.2d 1317 (1995), in support of affirming the judgment. While this case, given its unique facts, does not fall neatly within either doctrine, we find support from cases involving each doctrine in addressing the issue before us. Of course, it is the traditional test of proximate causation that we must apply regardless of the doctrine. Holton v. Memorial Hospital, 176 Ill. 2d 95, 107, 679 N.E.2d 1202 (1997) (reaffirming Borowski and holding that the traditional standard of proving causation applies in medical malpractice actions).

In her reply brief, Dr. Hameeduddin restates her principal

contention regarding proximate causation: "For Dr. Brown to opine that Dr. Ferguson and the decedent would have done something differently had Dr. Hameeduddin told them that Dr. Ferguson operated on the wrong level is purely speculative. Such speculation is not sufficient to support a causal connection between Dr. Hameeduddin not telling the decedent and Dr. Ferguson of the improper surgery and the decedent's pain." She contends that Aguilera and Scardina are instructive on the speculative nature of the claimed causal connection in this case. In Aguilera, the plaintiff's claim was that a delay in performing a CT scan was a proximate cause of the decedent's death. Aguilera, 293 Ill. App. 3d at 968. The plaintiff's theory was that an earlier CT scan would have led to neurosurgery to prevent or lessen the injury suffered by the decedent. However, the only neurosurgeons that testified agreed that an earlier CT scan would not have led to neurosurgery because the damage to the decedent's brain was beyond surgical help. Thus, there was no medical link between the alleged negligence in the delay in performing a CT scan and any treatment that might have been available. Aguilera, 293 Ill. App. 3d at 976.

A similar situation arose in Scardina. In that case, the trial court directed a verdict in favor of Dr. Nam based on the absence of any evidence that Dr. Nam's alleged failure to

properly read the radiological film lessened the effectiveness of the subsequent surgery.  The plaintiff's claim was that Dr. Nam's professional negligence resulted in the surgeon missing a portion of the plaintiff's damaged colon.  The directed verdict was affirmed in <u>Scardina</u> because there was no medical testimony that the radiological report impacted the surgeon's examination of the plaintiff's colon during the subsequent surgery.  <u>Scardina</u>, 333 Ill. App. 3d at 271.  The circumstances here are not comparable to those in <u>Aguilera</u> or <u>Scardina</u>.

Here, the plaintiff's theory is that Dr. Hameeduddin's failure to inform Mrs. Mansmith that Dr. Ferguson operated on the wrong part of her spine was a proximate cause of the pain and suffering she endured after Dr. Ferguson's negligent operation and the infection risk she faced by the epidural injection that resulted in the acute staph infection that killed her.  As to the medical treatment Mrs. Mansmith should have received, Drs. Ferguson, Fager, and Lustgarten, all testified that given the same pathology in 1997 that existed in 1996, the surgical operation that Mrs. Mansmith agreed to undergo in 1996 was the correct surgical operation for her in 1997.  Dr. Ferguson stated that he would have recommended that Mrs. Mansmith undergo a laminectomy at the L4-L5 area; that she was counterindicated for an epidural steroid, and the risk of infection was different

between a laminectomy and a steroid injection because with an epidural injection into the spinal canal, any infection would be much deeper and, hence, put Mrs. Mansmith at a greater risk.

Dr. Fager, Dr. Ferguson's expert witness, echoed Dr. Ferguson's testimony: "The only treatment would be the treatment that was originally planned for her. There would be no other treatment that would be the thing to do." In fact, Dr. Fager left no doubt as to his view on the epidural injection. "In my view, it was contraindicate[d]. I think it should never have been done. I think - - I can't think of doing anything worse to this lady at that point in time than putting a needle in her spine at that level where the spinal stenosis was and attempt to inject a steroid into that space around the dura covering over the nerves to her legs. I can't think of anything that would be worse. I would never have even considered doing that."

Dr. Fager further testified that the success rate for the laminectomy Dr. Ferguson intended to perform in 1996, and that Mrs. Mansmith should have received in 1997, was 90%. Dr. Lustgarten testified: "Had surgery been done properly, Mrs. Mansmith had a 90% or better probability of being cured of her leg pain, her back pain would also have felt better." Dr. Skaletsky stated in his report: "[I]t is not logical to initially operate on severe stenosis and then, when it is discovered that

**27**

the pathology and the same symptoms persist due to an improperly performed operation, to not perform the proper procedure."  Dr. Brown testified: "If surgery was need in June of '96, it was needed in August '97 ***."

As to Mrs. Mansmith's pain and suffering, Dr. Miz testified that on a scale of zero to 10, on August 28, 1997, Mrs. Mansmith's pain was at 10, and at 4 at its best.  It is also clear on the record that, had a laminectomy been properly performed in either 1996 or prior to December 1997, Mrs. Mansmith would never have undergone the epidural steroid injection, which resulted in the acute staph infection that killed her.

Against this evidence, neither Aguilera nor Scardina provides any support for Dr. Hameeduddin's contention that there is an absence of evidence on proximate cause in this case.  Nor does Dr. Hameeduddin even suggest that there is an absence of medical testimony between what Dr. Ferguson intended to do during the laminectomy in 1996 and what he would have done had Dr. Hameeduddin informed him in 1997 that he performed the laminectomy on the wrong level.  A broad reading of another "loss of chance" case, Gill v. Foster, 157 Ill. 2d 304, 626 N.E.2d 190 (1993), suggests that under the circumstances present here, the causal issue was properly left for the jury.  In Gill, the hospital was found not liable where the treating physician

**28**

testified that a nurse's failure to notify him of the patient's condition did not affect his treatment of the patient. Gill, 157 Ill. 2d at 311. Here, there was no testimony by Dr. Miz that he would have prescribed the same epidural steroid injection had he known that a neurosurgeon had concluded that a laminectomy was the proper medical treatment to provide relief to Mrs. Mansmith for her pathology. While a retort may be that the plaintiff should have asked Dr. Miz what he would have done had he known about Dr. Ferguson's opinion that only a laminectomy was the proper medical procedure, the plaintiff's focus was never on Dr. Miz, or what he should or should not have done. The plaintiff's case against Dr. Hameeduddin centered on what Dr. Hameeduddin knew and did not disclose, and what Dr. Ferguson would have done had Dr. Hameeduddin complied with the standard of care owed to Mrs. Mansmith.

Accordingly, we reject Dr. Hameeduddin's contention that it is pure speculation that Dr. Ferguson would have done anything differently had Dr. Hameeduddin informed him that he performed the laminectomy on the wrong level. Dr. Ferguson's testimony clearly supports the contrary.

We also note the jury was properly instructed that a fact may be proved by circumstantial evidence (IPI Civil (2000) No. 3.04), that facts may be proved by reasonable inferences drawn

**29**

from the evidence, and that it may use "common sense gained from your experiences in life in evaluating what you see and hear during trial" (IPI Civil (2000) No. 1.01).  At the very least, the medical evidence on proximate causation supported the reasonable inference apparently drawn by the jury that Dr. Ferguson would have done something differently had Dr. Hameeduddin informed him that he performed the laminectomy on the wrong level.  We note that Dr. Fager testified that Dr. Ferguson was never aware that he performed surgery on the wrong level based on the medical records he reviewed.  It was only Dr. Hameeduddin that received the records which showed Dr. Ferguson's malpractice.

The evidence recited above made the issue of proximate cause between Dr. Hameeduddin's professional negligence and what Dr. Ferguson would have done a question for the jury to answer.  See Holton, 176 Ill. 2d at 109 (proximate cause was a jury question where there was evidence "that the doctors would have undertaken a different course of treatment had they been accurately and promptly apprised of their patient's progressive paresis").

In her main brief, Dr. Hameeduddin contends that "[w]ithout any direct testimony from the decedent, plaintiff cannot sustain his burden as to causation."  Once again we disagree; no direct evidence was needed.  "The evidence was not direct, but it was

circumstantial; its strength would be a matter for the trier of fact." Pyne v. Witmer, 129 Ill. 2d 351, 362, 543 N.E.2d 1304 (1989).

We begin our review of the evidence of what Mrs. Mansmith would have done had Dr. Hameeduddin complied with her duty of care with what are essentially uncontested facts. In early 1996, Mrs. Mansmith was suffering from severe back pain and numbness in her legs. After months of conservative treatment proved unsuccessful in providing any long-term relief to Mrs. Mansmith, an MRI was ordered. As Dr. Eisenstein testified the standard of care then required Dr. Hameeduddin to discuss with Mrs. Mansmith the abnormalities on the MRI. The results of the MRI in turn prompted a referral to a specialist. Dr. Ferguson then saw Mrs. Mansmith and recommended a laminectomy at the L4-L5 area. Presumably, and consistent with Dr. Hameeduddin's standard of care, she discussed the available options with Mrs. Mansmith in light of Dr. Ferguson's recommendation. Mrs. Mansmith elected to undergo the laminectomy. In fact, Mrs. Mansmith spent little time in making her decision: she first saw Dr. Ferguson on August 7, 1996; the laminectomy was performed on August 12, 1996.

Here, the circumstantial evidence was sufficient to make the causal connection between Dr. Hameeduddin's professional negligence, as we have previously determined, and the ultimate

**31**

1-04-1243

injuries suffered by Mrs. Mansmith a question for the jury to determine.

> "Although defendant argues that plaintiff presented no evidence that the decedent would have acted any differently had she known that the results of the [medical test confirmed one medical condition over another], the record indicates otherwise. *** [Based on the evidence presented] it could be inferred that [the plaintiff and decedent] would have acted differently had the defendant communicated the results to them. *** Had the defendant communicated that the ultrasound test indicated an ectopic pregnancy rather than a miscarriage, it is not unreasonable to infer that medical help might have been sought sooner.  Thus, applying the <u>Pedrick</u> standard, we conclude that the trial court did not err in denying defendant's motion for a directed verdict."
> <u>Haist v. Wu</u>, 235 Ill. App. 3d 799, 821, 601 N.E.2d 927 (1992).

Our review of the record evidence here, taken in the light most

1-04-1243

favorable to the plaintiff, leads us to the same conclusion.  See also <u>Marshall v. University of Chicago Hospitals & Clinics</u>, 165 Ill. App. 3d 754, 758, 520 N.E.2d 740 (1987) (undisputed facts demonstrate an irrefutable conclusion that plaintiff would have acted presurgery as she acted post-surgery).

On the record before us, there was objective medical evidence that Mrs. Mansmith would have acted as she acted in August 1996 by undergoing a second laminectomy had she been informed that the laminectomy she underwent in 1996 was incorrectly performed.  As the same pathology existed in 1997 as existed in 1996, it was only logical that the "the only treatment would be the treatment that was originally planned for her."  A reasonable inference can be drawn, as the jury apparently did, that Mrs. Mansmith agreed to undergo a different surgery because, as the evidence suggests, she had the misimpression that the first surgery was performed properly and did not provide any relief.  It was natural and foreseeable that Mrs. Mansmith, without the benefit of the objective medical evidence possessed by Dr. Hameeduddin, would conclude that surgery, having provided no relief, an epidural injection was worth the risk.  It is also reasonable to infer that, had she been informed that the initial surgery she had agreed to, which, according to the medical testimony, provides relief to 90% of patients, she would have

**33**

chosen to undergo the proper surgery where the medical testimony was that the epidural injection provided at best temporary relief. Based on the evidence in the record, the jury was free to drawn the inference from the undisputed actions of Mrs. Mansmith in 1996, in light of the medical testimony, that she would have undergone a second laminectomy had she been properly informed. In reaching this conclusion, we take some guidance from the "informed consent" case cited by the plaintiff, Coryell, without necessarily agreeing with its statement that the "plaintiff was not required to present expert evidence specifically as to proximate causation." Coryell, 274 Ill. App. 3d at 546.

Under the doctrine of informed consent, there is no dispute that "a plaintiff must point to significant undisclosed information relating to the treatment which would have altered her decision to undergo it." Coryell, 274 Ill. App. 3d at 546. While there was "significant undisclosed information relating to treatment" in this case, what we take from Coryell is the recognition that there are certain "'"nonmedical judgment[s] reserved to the patient alone."'" Coryell, 274 Ill. App. 3d at 548, quoting Jambazian v. Borden, 25 Cal. App. 4th at 847-48, 30 Cal. Rptr. 2d 768, 775 (1994). While there was medical evidence on the issue of proximate causation present in the record, this

**34**

case, to a certain extent, also involves Mrs. Mansmith being deprived of the medical evidence to determine for herself what surgical procedure to undergo. While the trial court was correct in sustaining the objection to the question put to Dr. Brown as to what Mrs. Mansmith would have done had she known of Dr. Ferguson's negligent surgical operation as calling for speculation, we do not agree with Dr. Hameeduddin that, ipso facto, there was no evidence in the record on that precise point. The jury had more than sufficient evidence to make a reasonable and objective determination as to what Mrs. Mansmith likely would have done based on the evidence that was presented. "'[W]here death has sealed the lips of the one who might otherwise have shed the most light on the question. The plaintiff was compelled to tell his story with the best evidence available to him.'" Pyne, 129 Ill. 2d at 362, quoting Sloma v. Pfluger, 125 Ill. App. 2d 347, 358, 261 N.E.2d 323 (1970). To require more would in effect preclude Mrs. Mansmith, and others like her (however rare this may be given the absence in Illinois of a similar factual case) from receiving any relief for professional negligence that was clearly shown and clearly deprived her of making a nonmedical judgment reserved to her alone. We also take guidance from the caution expressed by our supreme court in the "loss of chance" case of Holton:

1-04-1243

> "To the extent a plaintiff's chance of
> recovery or survival is lessened by the
> malpractice, he or she should be able to
> present evidence to a jury that the
> defendant's malpractice, to a reasonable
> degree of medical certainty, proximately
> caused the increased risk of harm or lost
> chance of recovery. *** [Citations.] To hold
> otherwise would free health care providers
> from legal responsibility for even the
> grossest acts of negligence, as long as the
> patient upon whom the malpractice was
> performed already suffered an illness or
> injury ***." Holton, 176 Ill. 2d at 119.

Or, we add here, died before ever discovering the professional negligence that deprived her of the right to decide medical alternatives for herself.

Based on the evidence presented, we cannot say the jury was without evidentiary support as to each of the elements of a medical malpractice action in entering its verdict against Dr. Hameeduddin and in favor of the plaintiff. This is especially true where the trial court here "'guarded against [speculation] by the use of appropriate instruction[] to the jury'" in the form

**36**

a special interrogatory regarding sole proximate cause. Holton, 176 Ill. 2d at 107, quoting Borowski, 60 Ill. 2d at 424. As the trial court here succinctly stated: "[T]he failure to so inform the plaintiff or Dr. Ferguson depriving [Mrs. Mansmith] of the ability to be informed as to [the] status of her back condition was a question of fact for the jury to determine. They determined." The trial court did not err in denying Dr. Hameeduddin's motions for directed verdict or judgment n.o.v.

## C. Jury Instruction

Dr. Hameeduddin also argues that the trial court erred when it refused to instruct the jury that Dr. Ferguson had settled with the plaintiff and that he was no longer a defendant in the case. She contends that the court misled the jurors by allowing them to believe that Dr. Ferguson remained a defendant in the case and that no reasonable jury would have returned the $1.1 million award against her alone.

After the jury was instructed and had begun its deliberations, Dr. Ferguson reached a settlement agreement with the plaintiff. Dr. Hameeduddin then requested that the court give the jury IPI Civil (2000) No. 2.03, which read: "[R. Lawrence Ferguson, M.D.] is no longer a party to this case. You should not speculate as to the reason nor may the remaining parties comment on why [R. Lawrence Ferguson, M.D.] is no longer

**37**

1-04-1243

a party." The court denied Dr. Hameeduddin's request and did not submit the instruction to the jury.

The decision to provide the jury with a particular instruction is within the sound discretion of the trial court. The court's decision will not be reversed absent an abuse of discretion. "A trial court does not abuse its discretion so long as, 'taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles.'" York v. El-Ganzouri, 353 Ill. App. 3d 1, 32, 817 N.E.2d 1179 (2004), quoting Schultz v. Northeast Illinois Regional Commuter R.R. Corp., 201 Ill. 2d 260, 273-74, 775 N.E.2d 964 (2002).

IPI Civil (2000) No. 2.03 is intended to provide some uniformity to a trial court's practice of commenting on dismissals during trial. IPI Civil (2000) No. 2.03, Comment, at 18. The Notes on Use indicate that this is particularly important when a settlement agreement has the potential to bias a witness's testimony. IPI Civil (2000) No. 2.03, Notes on Use, at 18.

In this case, Dr. Ferguson testified at trial as a defendant, not as a party to a settlement agreement. He did not reach an agreement with the plaintiff until after the jury heard all of the evidence, was instructed on the applicable laws, and

sent to deliberate.  Therefore, concerns about whether the agreement biased his testimony were lessened.  In addition, the jury specifically found against Dr. Hameeduddin on each count.  On the verdict form the jury had the option of finding for or against Dr. Ferguson and Dr. Hameeduddin, individually, on each count.  If the jury had believed that Dr. Hameeduddin was only a "peripheral defendant," it could have found as such on the verdict form.  We also cannot say the trial court abused its discretion when it determined that deliberations had been on going for "a substantial period of time" when the instruction was tendered and the instruction would have put undue emphasis on the case against Dr. Hameeduddin.  Accordingly, we find that the trial court did not err in refusing to tender the instruction.

### D. Costs

Dr. Hameeduddin argues that the trial court erred when it assessed the costs of Dr. Ferguson's videotaped evidence deposition against her.  She contends that the evidence deposition was not necessary and that the plaintiff neither requested that Dr. Ferguson's evidence deposition be videotaped nor paid for it.

In Illinois, a prevailing party may recover costs if a statute or supreme court rule so provides.  Irwin v. McMillan, 322 Ill. App. 3d 861, 864, 750 N.E.2d 1246 (2001).  The supreme

court defines costs as "allowances in the nature of incidental damages awarded by law to reimburse the prevailing party, to some extend at least, for the expenses necessarily incurred in the assertion of his rights in court." Galowich v. Beech Aircraft Corp., 92 Ill. 2d 157, 165-66, 441 N.E.2d 318 (1982). Supreme Court Rule 208(d) notes that these "fees and charges may in the discretion of the trial court be taxed as costs." 134 Ill. 2d R. 208(d). A trial court's judgment awarding costs will not be reversed absent an abuse of discretion. Irwin, 322 Ill. App. 3d at 864.

Dr. Hameeduddin argues that the plaintiff did not pay for the videotaped deposition and he, therefore, should not be able to recover its costs. Both parties indicated that Dr. Ferguson's evidence deposition was taken at the request of Dr. Ferguson's attorney out of concern for Dr. Ferguson's health. Supreme Court Rule 206(g)(5) provides: "The party at whose instance the videotaped deposition is taken shall pay the charges of the videotape operator for attending and shall pay any charges for filing the videotape of an evidence deposition." 188 Ill. 2d R. 206(g)(5). If Dr. Ferguson's attorney requested that the deposition be videotaped, pursuant to Rule 206(g)(5) Dr. Ferguson would have been responsible for those costs. However, at oral arguments the plaintiff's attorney indicated that the plaintiff

bore the cost of Dr. Ferguson's videotaped evidence deposition. Further, we note that the record shows that it was "taken by the plaintiff."

Assuming that the plaintiff bore the costs of the videotaped evidence deposition, he cannot recover those costs unless the deposition was "necessarily used at trial," that is, it was "indispensable" to the trial. Irwin, 322 Ill. App. 3d at 865. The mere use of an evidence deposition at trial does not mean that the deposition was "necessary" or "indispensable" to trial. Further, the unavailability of a witness does not, by itself, rise to the level of being "indispensable." Irwin, 322 Ill. App. 3d at 866 and cases cited therein.

Prior to trial, Dr. Ferguson was diagnosed with a serious illness. He testified that although it would be difficult to attend the hearing every day, "I think I can come every day but I wouldn't stay for too long." Accordingly, his videotaped deposition was not "necessary" or "indispensable" to the trial. We therefore vacate the trial court's order awarding the plaintiff $1,009.55 for Dr. Ferguson's videotaped evidence deposition. See Irwin, 322 Ill. App. 3d at 869.

CONCLUSION

For the reasons stated, we affirm in part and vacate in part the judgment of the trial court.

1-04-1243

Affirmed in part and vacated in part.

SOUTH, J., concurs.

WOLFSON, J., dissents.

JUSTICE WOLFSON, dissenting:

Dr. Hameeduddin did not serve her patient well when she failed to tell her about the site of surgery discrepancies between Dr. Ferguson's post-operative report and the second MRI. The jury had the right to find that was a deviation from the standard of care, thin as it might be. At the same time, I believe the evidence concerning proximate cause, when viewed most favorably to the plaintiff, so overwhelming favors the defendant that the verdict for the plaintiff cannot stand. Snelson v. Kamm, 204 Ill. 2d 1, 42 (2003); Scardina v. Nam, 333 Ill. App. 3d 260, 270 (2002).

Plaintiff has pursued a theory, successfully so far, that never has been approved by any reported decision in this State. The plaintiff's theory is that Dr. Hameeduddin's failure to inform Mrs. Mansmith that Dr. Ferguson operated on the wrong part of her body was a proximate cause of the injuries incurred when Dr. Wiz recommended an epidural steroid injection, which then caused the acute staph infection that killed her.

**42**

1-04-1243

Plaintiff cites informed consent cases to support his contention that he did not have to present expert testimony to establish proximate cause. See, for example, Coryell v. Smith, 274 Ill. App. 3d 543 (1995); Zalezar v. Vercimak, 261 Ill. App. 3d 250 (1993); Casey v. Penn, 45 Ill. App. 3d 1068 (1977).

Our Supreme Court never has adopted the proposition that expert testimony is not required to prove proximate cause in informed consent cases. In fact, in a case involving a lack of communication between nursing staff and the attending physician the Supreme Court referred to the "general rule" that must be applied: "except in very simple cases, expert testimony is necessary in professional negligence cases to establish the standard of care and that its breach was the proximate cause of the plaintiff's injury." Snelson v. Kamm, 204 Ill. 2d at 43-44. (Emphasis added).

The case we decide today is not a "simple case." More significantly, it is not an informed consent case. The plaintiff does not claim the defendant failed to warn Mrs. Mansmith about foreseeable risks and complications involved in medical treatment performed by the defendant or someone under the defendant's control. See Coryell, 274 Ill. App. 3d at 549. In fact, the plaintiff expressly disclaims any desire to categorize this case as an informed consent case.

Nor is this a case where the defendant's negligence "compromised the effectiveness of treatment received or increased

**43**

the risk of harm to the plaintiff." Holton v. Memorial Hospital, 176 Ill. 2d 95, 119 (1997). That is, this is not a "loss of chance" case where the theory is used to prove cause-in-fact. Scardina v. Nam, 333 Ill. App. 3d at 269.

What, then, is this case? Plaintiff calls it a "failure to inform case." But he offers no support for the proposition that such a theory exists in this State. The barrier faced by plaintiff is the well-established proposition that in this medical negligence case he must "establish, to a reasonable degree of medical certainty, that the defendant's malpractice more probably than not caused his or her injury." Aguilera v. Mount Sinai Hospital Medical Center, 293 Ill. App. 3d 967, 972 (1997). The causal connection must not be contingent, speculative, or merely possible but, rather, "must be shown by such a degree of probability as to amount to a reasonable certainty that such a nexus exists." Scardina v. Nam, 333 Ill. App. 3d at 271; Susnis v. Radfar, 317 Ill. App. 3d 817, 827 (2000). Generally, simply creating a condition which makes the injury possible is not, standing alone, enough to establish proximate cause. Unger v. Eichleay Corp., 244 Ill. App. 3d 445, 451 (1993).

The factual chain from the defendant's lack of candor to the acute staph infection that killed Mrs. Mansmith has been stretched beyond the breaking point. The evidence invites the jury to guess and speculate. Dr. Brown's testimony engraved the invitation.

**44**

From the simple fact that at one point the Mansmiths expressed a desire to go to the University of Chicago Medical Center for a second opinion Dr. Brown concluded she would have sought a neurosurgical reevaluation and had a second operation. That is unsupported speculation. The Mansmiths did not seek a referral to the University of Chicago until after Mrs. Mansmith received the injection.

On several occasions, the trial court sustained objections when Dr. Brown attempted to testify to what, in his opinion, Mrs. Mansmith would have done if the defendant had told her about the discrepancy between Dr. Ferguson's operative report and the second MRI. The grounds for the objection were that the witness was being asked to speculate. The trial court rulings were correct. But then the jury was allowed to engage in that same speculation.

Plaintiff's cause is not aided by the fact that the defendant failed to inform Dr. Ferguson he might have operated on the wrong part of Mrs. Mansmith's back. The Mansmiths had decided not to return to Dr. Ferguson even before they learned about his misplaced surgery. For what conceivable reason would they return to him after learning about his gross negligence?

Dr. Wiz had access to Mrs. Mansmith's medical records. He recommended the epidural injection instead of the surgery because Mrs. Mansmith had increased risk factors for surgery and had suffered previous postsurgical problems. Neither at his deposition

**45**

nor at trial was Dr. Miz asked the question that might have fortified the plaintiff's causation theory. He never was asked if he would have recommended surgery instead of the epidural injection if he had been told that Dr. Ferguson may have operated at the wrong level. That omission speaks volumes. We are left with no credible evidence that the defendant's failure to inform Mrs. Mansmith had substantial impact on Dr. Wiz's decision to use the epidural injection.

Because I believe the evidence of proximate cause was deficient as a matter of law, I disagree with the majority's conclusion that the trial court did not err when it denied the defendant's motion or a judgment n.o.v. I also believe, given the unusual fact situation here, it was error to refuse to tell the deliberating jury the case against Dr. Ferguson had been settled. The grave and unnecessary risk of tarring Dr. Hameeduddin with Dr. Ferguson's flagrant misconduct could easily have been mitigated. I respectfully dissent.